## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00878-RM-KMT

JEFFERY WAYNE METZLER

     Plaintiff,

v.

CITY OF COLORADO SPRINGS**,** a municipality,
ELIZABETH REID, in her individual capacity,
JOHN CHADBOURNE, in his individual capacity,
CRAIG SIMPSON, in his individual capacity,
KEVIN CLARK, in his individual capacity,

     Defendants.

---

### AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff, by and through his attorneys, David A. Lane and Liana Orshan of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for his Amended Complaint as follows:

### I.    INTRODUCTION

1.    On August 9, 2017, Colorado Springs Police Department ("CSPD") officers lured a man suspected of soliciting sex with underage girls to a hotel in Colorado Springs as part of a joint sting operation with Homeland Security Investigations. The officers intended to arrest the man, identified as "Rick" (last name unknown), when he arrived at the hotel and confirmed his intent to purchase sex with an underage girl.

2.    When he arrived at the hotel, Rick spoke with undercover detective Elizabeth Reid about purchasing sex with the detective's "16-year-old sister." Despite multiple officers observing the conversation and Rick's truck, police failed to identify or arrest Rick, who walked away from the hotel after apparently sensing something awry with the transaction.

EXHIBIT A

3. Through a combination of failures on the part of Defendants to follow their own procedures, perform a minimally diligent investigation, or apply common sense, CSPD ultimately misidentified Rick as Mr. Metzler herein simply because Mr. Metzler at one time years earlier had an old phone number which matched that of Rick. Mr. Metzler had not used that phone number, however, for several years. Mr. Metzler was also tentatively identified in a Facebook posting as "Rick" by a detective, despite having little actual resemblance to Rick. Defendants then misrepresented evidence to a judge in order to acquire an arrest warrant for Mr. Metzler.

4. Mr. Metzler was arrested and jailed for approximately three days on two felony sex crime charges. Though he and his legal representatives offered copious exculpatory evidence to demonstrate his innocence, including an alibi backed by GPS evidence, Defendants refused to admit their mistake.

5. The charges against Mr. Metzler were not dismissed until February 12, 2018, over five months after he was arrested.

6. Mr. Metzler suffered and continues to suffer mental and emotional anguish and professional, reputational, and economic damages as a result of the false accusations and charges leveled against him by Defendants.

7. Defendants' conduct was performed under color of state law and directly or proximately caused the deprivation of Mr. Metzler's federally protected rights.

## II. JURISDICTION AND VENUE

8. This action arises under the Constitution and laws of the United States.

9. Jurisdiction over these claims is conferred upon this Court pursuant to 28 U.S.C. § 1331 and § 1343(a)(3). Jurisdiction supporting Plaintiffs' claims for attorney fees is conferred

**EXHIBIT A**

by and brought pursuant to 42 U.S.C. § 1988.

10.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State of Colorado at all relevant times stated herein.

### III.     PARTIES

**<u>Plaintiff</u>**:

11.     At all times relevant to the subject matter of this Complaint, Plaintiff Jeffery Wayne Metzler was a citizen of the United States of America and a resident of the State of Colorado.

**<u>Defendants</u>**:

12.     The City of Colorado Springs is a Colorado municipality organized under the laws of the State of Colorado. The Colorado Springs Police Department ("CSPD") is a law enforcement agency that is part of the City of Colorado Springs.

13.     At all times relevant to the subject matter of this Complaint, Detective Elisabeth Reid was a citizen of the United States and a resident of Colorado. At all relevant times, Detective Reid was employed by the City of Colorado Springs as a peace officer for the CSPD. At all relevant times, Detective Reid was acting within the scope of her employment, pursuant to her official duties, and under the color of state law.

14.     At all times relevant to the subject matter of this Complaint, Detective John Chadbourne was a citizen of the United States and a resident of Colorado. At all relevant times, Detective Chadbourne was employed by the City of Colorado Springs as a peace officer for the CSPD. At all relevant times, Detective Chadbourne was acting within the scope of his employment, pursuant to his official duties, and under the color of state law.

**EXHIBIT A**

15.     At all times relevant to the subject matter of this Complaint, Sergeant Craig Simpson was a citizen of the United States and a resident of Colorado. At all relevant times, Sergeant Simpson was employed by the City of Colorado Springs as a peace officer for the CSPD. At all relevant times, Sergeant Simpson was acting within the scope of his employment, pursuant to his official duties, and under the color of state law.

16.     At all times relevant to the subject matter of this Complaint, Crime Analyst Kevin Clark was a citizen of the United States and a resident of Colorado. At all relevant times, Mr. Clark was employed by the City of Colorado Springs as a peace officer for the CSPD. At all relevant times, Mr. Clark was acting within the scope of his employment, pursuant to his official duties, and under the color of state law.

## IV.     FACTUAL ALLEGATIONS

### Mr. Metzler was collateral damage of a botched sting operation undertaken by the CSPD.

17.     In 2017, officers of the CSPD Metro Vice, Narcotics and Intelligence Unit executed an undercover "sting" operation ("the operation") in collaboration with Department of Homeland Security Investigations personnel. The objective of the operation was to identify and arrest individuals seeking to purchase sex with juvenile girls.

18.     As part of the operation, Defendant Detective Elisabeth Reid placed multiple ads for prostitution services on the "women seeking men" section of Backpage.com, a now-defunct website known for advertising prostitution services disguised as personal ads.

19.     When a potential customer would call the phone number listed in Detective Reid's Backpage.com ads, she would pose as "Lizzie." As Lizzie, Detective Reid would attempt to arrange for Lizzie's fictional little sister, aged 16, to have sex with men in exchange for money.

**EXHIBIT A**

20.    If the customer agreed to the arrangement, Detective Reid would set up a meeting at the Sonesta ES Suites, a hotel in Colorado Springs. Detective Reid would meet the customer at the hotel. Once she confirmed that he was there to have sex with a juvenile girl and that he had money to pay, she would provide him with a room key and condom.

21.    A team of other CSPD officers would surveil and cover Detective Reid during this transaction. When the customer arrived at the hotel room, a second team of uniformed officers would be waiting there to arrest him.

22.    On August 9, 2017, a man who identified himself as "Rick" called the phone number listed in Detective Reid's Backpage.com ads. After a brief conversation with "Lizzie," Rick agreed to pay for sex with Lizzie's 16-year-old sister.

23.    Rick was not Plaintiff Jeffery Metzler.

24.    Over the course of the next several hours, Rick repeatedly called Lizzie to confirm that he was en route to the Sonesta ES Suites.

25.    At approximately 3:55 p.m., Detective Reid observed "an older model flat-bed pickup truck with a tool box and large antenna" drive into the Wendy's parking lot near the Sonesta ES Suites. Detective Reid noted that the driver was wearing a yellow T-shirt. Incredibly, no officer managed to note Rick's license plate number.

26.    A few minutes later, Rick called Lizzie to inform her that he was at the Wendy's and that he was lost; she provided him with directions. Detective Reid then spotted a man in a yellow t-shirt walking toward the hotel.

27.    The other CSPD personnel on scene at the Sonesta ES Suites who were participating in the operation included at least Defendant Detective John Chadbourne, Detective

5

**EXHIBIT A**

Alan Marks, Detective Kerry Linfoot, Defendant Sergeant Craig Simpson, and Detective Benjamin Heule.

28.     Detective Chadbourne also noted that Rick had been observed in a "black, flatbed pickup truck with antennas located on the roof," but did not note the license plate, nor did any other member of the CSPD team on scene.

29.     Rick met with Detective Reid in the hotel's parking lot. CSPD personnel recorded audio and video of the interaction in the parking lot, and several members of the CSPD team observed the meeting.  Detective Reid apparently failed to use a body-cam to record the interaction with Rick.

30.     As per the operation's procedure, Detective Reid spoke briefly with Rick, confirmed that he had money, and provided him with a condom and a room key. Detective Reid then told Rick that she needed to do some laundry and left him in the parking lot.

31.     Rick started walking up a flight of stairs toward the room that Detective Reid had indicated. However, rather than entering the room, Rick stopped at a landing, turned around, and walked back down the stairs into the hotel complex.

32.     Despite the presence of numerous CSPD personnel, including the team assigned to surveil Rick's interaction with Detective Reid and the team assigned to arrest Rick when he reached the hotel room, CSPD inexplicably failed to arrest Rick at the hotel, record his license number, or obtain any evidence to figure out who Rick was.

33.     Indeed, Detective Linfoot actually crossed paths with Rick on foot as he exited the hotel. Detective Linfoot bafflingly made no effort of any kind to detain him.

**EXHIBIT A**

34.     Although Detective Reid and Detective Chadbourne had seen Rick arrive at the Sonesta ES Suites after parking his truck at the nearby Wendy's parking lot, no CSPD personnel had been stationed at or near the truck to prevent Rick's departure.

35.     After a brief search, the CSPD personnel gave up on finding Rick near the hotel.

**The CSPD scrambled to find any lead to re-locating the suspect, resulting in the misidentification of Mr. Metzler as "Rick."**

36.     Sergeant Simpson, who was the supervisor for the operation, instructed Defendant CSPD Analyst Kevin Clark to attempt to identify "Rick" based on the phone number that had been used to contact Detective Reid, (719) 238-0475.

37.     Analyst Clark failed to identify Rick. Instead, he misidentified Plaintiff Jeffery Metzler as the current owner of the phone number despite the clear evidence that Metzler hadn't been tied to that number in years. The database Analyst Clark used very likely had indicated that Mr. Metzler was not the current owner of the phone number.

38.     In fact, Mr. Metzler had only used that phone number for approximately six months in late 2011 and early 2012. At that time, the number was associated with a company cell phone belonging to Mr. Metzler's then-employer, Fittje Brothers Printing Company. When Mr. Metzler left Fittje Brothers, he returned the phone to the company and ceased using the associated number.

39.     Between Mr. Metzler's departure from Fittje Brothers in 2012 and CSPD's sting operation in August 2017, the number had belonged to at least two owners after Mr. Metzler, a fact easily verifiable by basic investigative tools. Indeed, a private investigator later hired by Mr. Metzler's defense attorney was able to determine that the number had belonged to at least two owners after Mr. Metzler through a simple search of common databases, including Accurint, Transunion, and Locate Plus.

**EXHIBIT A**

40.     CSPD made no such basic efforts to determine whether the phone number was Mr. Metzler's number when "Rick" called Detective Reid.

41.     On the basis of the incorrect phone number association, CSPD personnel including Analyst Clark pulled Mr. Metzler's driver's license information and accessed his personal Facebook page to forward several photos of Mr. Metzler to the officers who had been on scene at the Sonesta ES Suites.

42.     As the involved officers knew or should have known, police officers are just as susceptible to confirmation bias as civilians.

43.     In violation of CSPD policy, CSPD failed to place the photos of Jeff Metzler in a photo lineup or to otherwise take measures to reduce bias in the identification of the individual in the photos.

44.     As the involved officers knew, CSPD policy on "Sequential Photographic Identifications" provides an extensive, detailed procedure for conducting photo identifications with minimal bias.

45.     The officers involved in this identification violated nearly every element of the CSPD Photographic Identification procedure, including the most basic step of constructing a lineup with a minimum of five "fillers" (photographs of individuals not believed to be suspects).

46.     Instead of following procedure, the team simply looked at the photos of Mr. Metzler and decided that he was Rick, *after* they were aware that CSPD's analyst had returned Mr. Metzler's name for Rick's phone number, a biasing factor that was or should have been obvious to each one of the trained CSPD personnel involved in the photographic identification.

47.     Additionally, CSPD personnel ignored the fact that the Facebook photos were from 2012, 2013, and 2014, and Mr. Metzler's driver's license photo was from 2014, years

**EXHIBIT A**

before the sting operation. But Mr. Metzler, who has diabetes, had been placed on a diet and lost

a significant amount of weight since 2014. To the extent there arguably could have been any

superficial resemblance between Mr. Metzler's heavier 2014 frame and Rick, no such

resemblance existed by the time that the CSPD officers performed their photo identification in

2017.

48.     CSPD did not have any photos of Rick from the sting operation, even though, per

his report, Detective John Chadbourne had been assigned to "take photos of the sex buyer,"

because Detective Chadbourne failed to take even a single photo during the operation. As a

result, throughout CSPD's investigation of Mr. Metzler, only grainy still images taken from the

video recording of the interaction with Rick were available for comparison to Mr. Metzler, rather

than higher definition photos.

49.     Similarly, Detective Benjamin Heule had been assigned to record audio and video

of the interaction between Rick and Detective Reid, but Detective Heule lost the primary audio

recording to "accidental deletion."

50.     As a result of these errors and policy violations, members of the CSPD team

misidentified Mr. Metzler as Rick. In her report, Detective Reid stated that Mr. Metzler's

driver's license photo "matched" the man she had seen at the Sonesta ES Suites, and that the

photos on Mr. Metzler's Facebook page "were of the individual who met me an [sic] identified

himself as AKA Rick."

51.     Detective Chadbourne likewise stated in his report that, "I was able to positively

identify the Facebook picture as being the same person who made the deal with the UC, Jeffery

Metzler."

**Detective Reid falsely swore an affidavit in order to acquire an arrest warrant.**

9

**EXHIBIT A**

52.     In her five-page Affidavit for the Issuance of an Arrest Warrant submitted August 30, 2017, Detective Reid included only two sentences to explain why she believed that Jeff Metzler was the man she had encountered in the Sonesta ES Suites parking lot:

> A subsequent search of a law enforcement database yielded that the phone number 719-238-0475 listed to a Jeffery Wayne Metzler, DOB [redacted]. A Colorado Driver License photograph of Jeffery Metzler was requested and the photograph on the Driver License matched the male individual who agreed to have sexual intercourse, in exchange for money, with a 16 year old.

53.     Detective Reid's affidavit materially omitted the fact that the association of the phone number 719-238-0475 to Mr. Metzler was not based on information that Mr. Metzler currently possessed that number.

54.     Both pieces of evidence upon which the Affidavit relies to connect Mr. Metzler to the failed prostitution sting—the search of an unnamed "law enforcement database" and Detective Reid's errant assertion that Mr. Metzler's license photo "matched" Rick—were generated wholly through the defendant officers' policy violations and failures to perform a minimal further investigation that would have exonerated Mr. Metzler.

55.     When Mr. Metzler turned himself in at the CSPD Police Operation Center (POC) on September 4, 2017, the POC Watch Commander, Officer Matthew Peterson, noted the following:

> Metzler's warrant had a note for Det. Reid…to be contacted upon his arrest. Det. Reid was contacted by phone and [she] advised [me] that she would be coming to the POC to show me photographs of the suspect from the case…Det. Reid had me review video of the incident and still shots of the suspect from the video. The suspect in the video and photographs had similar characteristics to that of Metzler and the voice sounded similar.

56.     Thus, although Detective Reid had sworn to a judge that Mr. Metzler's picture "matched" the suspect she had met in person, five days later, *after Mr. Metzler had already been*

**EXHIBIT A**

*taken into custody,* Detective Reid still sought verification that Mr. Metzler was in fact the suspect.

57.     Detective Reid's own report of her interaction with Officer Peterson details that she still sought confirmation that Mr. Metzler was the man she intended to arrest, even though an arrest warrant had already issued based on her sworn testimony that Mr. Metzler's image "matched" Rick. Detective Reid stated in her report that "[she] informed Officer Peterson that [she] would respond to the Police Operation Center to show him a video of my contact with [Rick], dated August 9, 2017 *to confirm the identity of AKA Rick as Jeffery Metzler*." (Emphasis added).

58.     Plainly, Detective Reid's sworn statement that Mr. Metzler's picture "matched" Rick should have been, but was not, qualified by the lingering doubts she had that the driver's license pictured the same individual who was the subject of the botched sting operation.

**After the arrest warrant was granted, CSPD personnel failed to heed numerous indications that Mr. Metzler was not "Rick."**

59.     On August 30, 2017, at Detective Reid's direction, Officer Drew Jeltes called the number that Rick had used during the botched sting operation to ask Jeffery Metzler to turn himself in for arrest. A man answered, and Officer Jeltes inquired as to whether he was Jeffery Metzler; the man stated that he was not. When Officer Jeltes identified himself as a police officer and asked if the man could provide contact information for Mr. Metzler, the man ended the call.

60.     CSPD personnel made no further attempts to contact the man who had answered Rick's phone.

61.     Later that day, Officer Jeltes and Detective Chadbourne went to Mr. Metzler's house in Colorado Springs. They were unable to contact Mr. Metzler or anyone else at his house, and instead began to interview his neighbors.

**EXHIBIT A**

62.     None of Mr. Metzler's neighbors recalled seeing an older pickup truck with antennas on top—the description of the vehicle that CSPD officers witnessed Rick driving.

63.     Mr. Metzler had never owned a vehicle of that description.

64.     Despite having access to video stills of Rick from the botched sting operation, Officer Jeltes and Detective Chadbourne did not ask any of the neighbors to look at the pictures or otherwise attempt to confirm the biased identification that Detective Chadbourne, Detective Reid, and the other personnel on scene at the Sonesta ES Suites had performed.

65.     One of Mr. Metzler's neighbors provided Officer Jeltes with Mr. Metzler's actual cell phone number. That number did not match the number that Rick had used to contact Detective Reid.

66.     Officer Jeltes called the number provided by the neighbor, and Mr. Metzler answered the phone and immediately identified himself.

67.     Officer Jeltes informed Mr. Metzler that police had an arrest warrant for him for soliciting a prostitute, and that the warrant was related to an incident that had occurred on August 9, 2017, at the Sonesta ES Suites.

68.     Officer Jeltes reported that Mr. Metzler sounded "puzzled" and said that he was not familiar with the location of the alleged crime.

69.     Mr. Metzler asked for a callback number, and Officer Jeltes provided his cell phone number. Mr. Metzler called Officer Jeltes back from another number shortly thereafter; when Officer Jeltes identified himself, Mr. Metzler stated that he wanted to confirm that the officer was whom he claimed to be, indicating he thought the call might have been a prank.

70.     Mr. Metzler contacted CSPD Lt. H. Velasquez, a social acquaintance, to confirm that Officer Jeltes was a genuine police office and to verify that there actually was a warrant for

12

**EXHIBIT A**

his arrest. Mr. Metzler thought that maybe Officer Jeltes and Detective Chadbourne were not whom they claimed to be, due to the outrageous nature of the crime of which they accused him

71.     Mr. Metzler also called CSPD Officer Roberto Williamson, another acquaintance, to try to confirm what Officer Jeltes had said. Mr. Metzler told Officer Williamson that he believed that he was the victim of a case of mistaken identity, and that he had not been in town at the time of the alleged crime. Officer Williamson advised him to retain legal counsel and to turn himself in.

72.     No CSPD officer previously or immediately thereafter made any attempt to confirm that Mr. Metzler had been out of town at the time of the sting operation.

73.     On September 1, 2017, Officer Jeltes assisted Detective Reid in preparing a search warrant for AT&T cell phone number (719) 238-0475, the number that Rick had used to contact Detective Reid.

74.     The warrant requested "historical location information for AT&T cell phone number 719-238-0475 for the date of August 9, 2017," the date of the failed sting operation.

75.     Although Officer Jeltes and Detective Chadbourne had learned Mr. Metzler's actual cell phone number, and had spoken to Mr. Metzler via that number only a day earlier, the CSPD Defendants failed to take the supremely obvious investigative step of requesting location information for that cell phone number as well. A comparison of the location data for Rick's number and Mr. Metzler's number would have demonstrated that Mr. Metzler was not present at the same locations as Rick when Rick placed his calls to Detective Reid.

76.     On October 31, 2017, CSPD Analyst Kevin Clark would use data acquired from AT&T to create a map of Rick's locations when his cell phone was active on August 9, 2017.

EXHIBIT A

The map indicated that Rick had placed his first call from Fountain, Colorado, and from there made his way to the Sonesta ES Suites in Colorado Springs.

77.    No CSPD officer ever traveled to Fountain to attempt to locate or otherwise investigate Rick.

78.    No CSPD officer ever even contacted Fountain-based law enforcement to make any inquiry regarding Rick.

**Between the day that Mr. Metzler turned himself in and the day that the charges against him were dismissed in February 2018, CSPD continued to discover and ignore evidence that pointed towards Mr. Metzler's innocence.**

79.    On September 4, 2017, Mr. Metzler turned himself in at the CSPD Operations Center. His wife and children were also present to support him, and his daughter wept as he was patted down and handcuffed. Mr. Metzler spent two days in jail before bonding out.

80.    On September 13, 2017, the El Paso County District Attorney charged Mr. Metzler with two felony counts of soliciting for child prostitution. On October 25, 2017, the District Attorney added a third felony charge against Mr. Metzler, pandering of a child.

81.    For no clear reason, CSPD waited several months before resuming its investigation. On January 29, 2018, Detective Chadbourne visited Overhead Door Colorado Springs, Mr. Metzler's former employer, where he spoke to Rance Claypool, who had worked there for several years and knew Mr. Metzler. Detective Chadbourne described the interaction in his report:

> I showed Claypool the same black and white photo [of the subject who showed up at the Sonesta Extended Stay Suites] and he stated that the person has a familiar face, however didn't know who it was. I asked Claypool if he knew Jeff Metzler and he stated yes. I asked if this could be him and he stated "not unless he gained a bunch of weight." *Claypool then said he hasn't seen Metzler in a while, but doesn't believe it's him.*

(Emphasis added.)

**EXHIBIT A**

82.     Additionally, Detective Chadbourne spoke to Robin Hanson, another Overhead Door employee who was also Mr. Metzler's step-sister. Ms. Hanson was also shown the black and white photo of Rick; she told Detective Chadbourne that she "immediately knew that it was not Jeff in that photo."

83.     Detective Chadbourne did not so much as make a note of Ms. Hanson's assertion that the man in his photograph was not Mr. Metzler; Mr. Metzler only learned about Ms. Hanson's conversation with Detective Chadbourne after Ms. Hanson told Mr. Metzler's criminal defense attorney about it.

84.     Detective Chadbourne made no effort of any kind to follow up on Mr. Claypool's and Ms. Hanson's assertions that the man who had been photographed at the Sonesta ES Suites on August 9, 2017, was not Mr. Metzler.

85.     Though CSPD accused Mr. Metzler of contacting "Lizzie" by telephone after seeing an advertisement for her sexual services on Backpage.com, CSPD never seized or searched Mr. Metzler's telephones or home or work computers. Had they taken this obvious investigative step, CSPD would quickly have discovered that Mr. Metzler had not visited "Lizzie's" sex advertisement, and had not called the number that that advertisement offered.

86.     It was not until February 8, 2018—over five months after Mr. Metzler's arrest—that CSPD took the basic investigative step of contacting Mr. Metzler's employer at the time of the arrest, Overhead Door Denver. On that day, Detective John Allen spoke with several employees of Overhead Door Denver, including the President and Vice President of the company and an administrative worker, all of whom denied that the still image of Rick was Mr. Metzler.

87.     Moreover, had CSPD made this basic effort when they began to investigate Mr. Metzler in August 2017, detectives would have discovered that on August 9, 2017, Mr. Metzler

**EXHIBIT A**

was driving an Overhead Door Denver company vehicle, which only Mr. Metzler drove, that was equipped with a GPS device. The Vice President of Overhead Door Denver provided Detective Allen with the GPS data from Mr. Metzler's company vehicle *on the same day* that Detective Allen came to Overhead Door.

88.    A comparison of the Overhead Door Denver company vehicle's GPS data to the location data for Rick's cell phone number demonstrated that Mr. Metzler was many miles away from Rick when Rick's phone was active and when Rick was speaking to "Lizzie."

89.    During his unjustifiably belated visit to Overhead Door Denver, Detective Allen loudly informed the Overhead Door Denver employees that Mr. Metzler was under criminal investigation as he showed them the still image of Rick. None of the employees at Overhead Door Denver identified the image of "Rick" as Mr. Metzler.

90.    Though numerous CSPD employees were personally familiar with Mr. Metzler, including Lieutenant Velasquez and Officer Williamson, neither Detective Reid, Detective Chadbourne, nor any of the other CSPD officers involved in the botched sting operation showed the video or still images of Rick at the Sonesta ES Suites to those CSPD employees to determine whether they believed Mr. Metzler to be Rick.

91.    CSPD failed to even compare current pictures of Mr. Metzler to the still images of Rick taken at the Sonesta ES Suites.

92.    Mr. Metzler's features differ from those of Rick in ways that would have been obvious to any police investigator who made a reasonable effort to determine whether Mr. Metzler was Rick.

93.    For instance, Mr. Metzler is obviously thinner and of a fairer complexion than Rick. His hairline is not receding, as Rick's was. His earlobes are not attached like Rick's. Mr.

**EXHIBIT A**

Metzler has two spots on the right of his face that look like moles; Rick did not have these facial marks. Mr. Metzler has a long, oval face, whereas Rick's face is round, with fatter cheeks. Indeed, beyond being a middle-aged white male, Mr. Metzler scarcely resembles Rick at all.

94. Despite the extensive evidence showing that Mr. Metzler was not Rick, it was not until February 9, 2018, that the District Attorney's Office acknowledged that it could not prove its case and filed a motion to dismiss the charges.

95. The court dismissed the charges against Mr. Metzler on February 12, 2018.

**Mr. Metzler suffered significant damages due to CSPD's unlawful conduct.**

96. For the six months following his arrest until the court dismissed the charges, Mr. Metzler suffered extreme stress from living under the false accusation of a child sex crime.

97. Mr. Metzler spent two nights in jail, in constant fear for his life. Mr. Metzler worried that once other inmates became aware of his charges—and many already had due to their presence when he was arraigned—they would bully him and assault him. He was forced to repeatedly deflect and evade questions about why he was there, especially when he encountered a person with whom he had previously worked. Even the fact that he was in jail at all was reputationally damaging and emotionally distressing to Mr. Metzler, an upstanding, law-abiding citizen who had never been to jail before.

98. When Mr. Metzler was finally released on bond, the impacts of the arrest on his day-to-day life were immediate and severe.

99. Mr. Metzler and his wife were forced to borrow $50,000 from her mother's trust in order to pay for a lawyer to defend Mr. Metzler against the false charges.

100. Mr. Metzler's employment prospects were continuously hindered by the pending felony charges against him. For instance, Mr. Metzler had been in the process of negotiating a

**EXHIBIT A**

new position with his former employer, Overhead Door Colorado Springs, at the time of his

arrest. However, Mr. Metzler missed a scheduled phone call with the company because he was in

jail, and the opportunity evaporated as a result. Mr. Metzler's professional reputation was also

damaged through Detective Allen's conduct at Overhead Door Denver. Mr. Metzler's reputation

with his professional contacts at Overhead Door Denver was permanently damaged.

101.    Mr. Metzler eventually took a job with Improve Group; in his work for that

company, he often was required to enter the NORAD military base. In order to perform his job

duties, Mr. Metzler needed to acquire a "CAC card," which would allow him to pass quickly

onto the base without a full security check.

102.    Due to his pending felony charges, Mr. Metzler was at first entirely denied the

CAC card, and was later forced to reveal the nature of his charges to both coworkers and base

personnel in order to acquire the card.

103.    Mr. Metzler could no longer volunteer at his church with his daughter, could no

longer possess firearms (Mr. Metzler is an avid hunter, and had planned a hunting trip with his

daughter and son-in-law the very weekend that the police first sought his arrest), and feared to

even leave his house after the arrest.

104.    Mr. Metzler was paranoid of leaving his house for months, fearful that he would

be recognized by someone from jail. He started to worry that others were looking at him and

talking about him in public. He withdrew from friendships and other relationships, fearful of

having to explain his arrest for a sex crime against a minor.

105.    Mr. Metzler's physical and mental health deteriorated. As a result of his

depression, Mr. Metzler stopped working out, and regained much of the weight and the increased

blood pressure and glucose levels that he had worked hard to lose over the previous five years in

**EXHIBIT A**

the interest of fending off his diabetes. He began taking new medications to try to control his blood pressure.

106.    Mr. Metzler was diagnosed with post-traumatic stress disorder after visiting a counselor in an attempt to resolve the negative emotions associated with the false accusation and arrest by CSPD.

107.    Even after the charges were dismissed, Mr. Metzler suffered and continues to suffer adverse effects in his community, personally and professionally, because of CSPD's unlawful behavior.

108.    To this day, Mr. Metzler has yet to receive so much as an apology from CSPD or any of the individual CSPD officers responsible for the colossal failures to follow police policy or perform an even minimally diligent investigation into the crime of which he was accused.

**CSPD has a lengthy history of making arrests without any arguable probable cause.**

109.    Sadly, CSPD has a history of making arrests without probable cause—an issue that should have long since been addressed by the City of Colorado Springs. The following cases show that at the time of Mr. Metzler's arrest, there was an obvious need for CSPD to provide further training to its officers on the necessity of establishing probable cause before making an arrest.

110.    On November 2, 2017, Terrell Clayton was arrested after filming a police station from a public sidewalk. CSPD officers forcibly detained Mr. Clayton despite lacking probable cause that he committed any crime.

111.    On March 25, 2015, Ryan and Benjamin Brown were pulled over and arrested by CSPD officers without probable cause after the officers grew angry that they were being filmed.

**EXHIBIT A**

112.     Only July 4, 2013, Grant Bloomquist was arrested without probable cause after he verbally protested two CSPD officers' beating of another man outside of a nightclub.

113.     On January 26, 2012, John Sturgis was arrested without probable cause and subjected to excessive force by CSPD officers after a civilian witness misidentified Mr. Sturgis as a homicide suspect. The witness told CSPD officers that he had seen a man at a gas station—Mr. Sturgis—who resembled a homicide suspect, and the officers followed Mr. Sturgis and arrested him. Though Mr. Sturgis was not the homicide suspect, was approximately twice the estimated age of the suspect (20), and was bald while the suspect was described as having hair (among numerous other physical dissimilarities), the officers still elected to arrest him without any cause to believe that he was the suspect. Mr. Sturgis surrendered peacefully and asked the officers not to handcuff him behind his back because he had recently had surgery on his shoulder; he even offered to show the officers MRI images of his injured shoulder that were sitting on his front seat as proof. The officers ignored Mr. Sturgis's pleas, and roughly handcuffed him by the back, causing Mr. Sturgis to reinjure his shoulder and require further surgery. Several officers falsified their reports about the incident in an unsuccessful effort to invent probable cause to arrest Mr. Sturgis.

114.     On October 12, 2012, CSPD wrongfully arrested Ethan Pace for sexual assault after the lead detective omitted critical exculpatory evidence from the arrest warrant affidavit, despite being fully aware of such evidence.

115.     On July 21, 2012, James Sorensen was arrested without probable cause for violating a law banning guns in parks; that law had been repealed in 2003.

116.     Also in 2012, the City of Colorado Springs paid $480,000 to settle claims that two CSPD officers had conspired to falsely charge, falsely arrest, and maliciously prosecute one of

EXHIBIT A

the officers' ex-boyfriends, a Jarrott Martinez. Despite Mr. Martinez's presentation of a video-supported alibi for the time period when he was accused of the false charges, CSPD supported his prosecution through two criminal trials.

117.    In 2009, Joseph Martinez was arrested after a CSPD officer misidentified him as the individual who had sold him drugs during an undercover operation. The officer knew the drug dealer to be nicknamed "Casper," and searched for mugshots of individuals associated with that nickname. He incorrectly selected Mr. Martinez's photograph. When Mr. Martinez turned himself in and professed his innocence, officers made no effort whatsoever to confirm the bad identification that had led to the arrest, even though Mr. Martinez lacked the only identifying mark of which the undercover officer had taken note, a tattoo on his shin. Mr. Martinez spent approximately 40 days in jail before he could bond out, and his case was ultimately dismissed for lack of evidence.

118.    Also in 2009, CSPD officers illegally detained Evan Bank and searched his home of Evan Bark after misidentifying him as a suspect in an armed robbery. Mr. Bark is Caucasian; the officers were investigating a robbery committed by two men who had been described as African-American. The only connection between the robbery and Mr. Bark was a statement from a witness who had followed a car near the scene of the robbery believing that the car was involved in the robbery; that car was Mr. Bark's vehicle, and the witness had noted his license plate number. However, the witness specifically stated to the investigating CSPD detectives that the car she had seen was not involved in the robbery, as the involved vehicle had tinted windows and Mr. Bark's vehicle did not. Nonetheless, on the basis of this witness statement that was plainly insufficient to establish probable cause, officers warrantlessly searched Mr. Bark's home and vehicles and detained him in handcuffs for several hours.

**EXHIBIT A**

119.     Several of these representative cases resulted in the City of Colorado Springs paying hundreds of thousands of dollars to settle false arrest claims, yet the facts surrounding Mr. Metzler's case make apparent that the Colorado Springs Police Department has yet to learn its lesson and adequately train its officers on the probable cause requirement, especially as it relates to evaluating **all** information known to the officer(s) in determining whether probable cause exists.

## V.     STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment Violation – Unlawful Seizure

120.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

121.     At all times relevant to the subject matter of this Complaint, Defendant Officers were acting under color of state law in their capacities as officers with CSPD and within the scope of their employment.

122.     Mr. Metzler has a constitutionally protected right to be secure in his person against unreasonable seizures.

123.     No Defendant CSPD Officer involved in the arrest at any time had probable cause to believe that Mr. Metzler had committed any violation of the law prior to causing him to be arrested.

124.     Minimal further investigation by or ordered by the Defendant CSPD Officers would have exonerated Mr. Metzler.

125.     Defendant CSPD Officers caused Mr. Metzler to be seized, as described herein, by unreasonably failing to conduct such minimal investigation and ignoring easily accessible information.

**EXHIBIT A**

126.   Defendant CSPD Officers' knowingly or recklessly failed to consider all information in possession of the CSPD in determining whether there was probable cause to arrest Mr. Metzler and on which to base an arrest warrant.

127.   Defendant CSPD Officers' failure to conduct a more complete investigation was done with a knowing or reckless disregard for the truth.

128.   Defendant Detective Reid knowingly or recklessly omitted from her affidavit in support of the arrest warrant information which, if included, would have shown the lack of probable cause, including, but not limited to, information that Mr. Metzler had "Rick's" phone number was not current and information regarding her doubts about whether Mr. Metzler was Rick.

129.   Defendant CSPD Officers' actions were objectively unreasonable in light of the circumstances confronting them.

130.   Defendant CSPD Officers engaged in these actions recklessly, intentionally, willfully and wantonly.

131.   The acts and omissions of Defendant CSPD Officers were the moving force behind and the proximate cause of Mr. Metzler's seizure and injuries therefrom.

132.   Existing law at the time of the seizure clearly established that a peace officer violates an individual's Fourth Amendment right to be free from unreasonable seizure if the officer caused the individual to be seized without probable cause. Defendant CSPD Officers knew or reasonably should have known that their actions in seizing Mr. Metzler, taken within the scope of their official duties and employment, violated this clearly established constitutional right.

**EXHIBIT A**

133.    The acts and omissions of Defendant CSPD Officers were taken pursuant to the custom, policy, and/or practice of Defendant Colorado Springs, which encourages, condones, tolerates, and ratifies the arrests without probable cause.

134.    Defendant Colorado Springs was at all time relevant, a policymaker for the CSPD, and established policies, procedures, customs and/or practices for CSPD and possessed responsibility for training CSPD officers.

135.    Defendant Colorado Springs developed and maintained law enforcement related policies, procedures, customs, and/or practices, including those related to training CSPD officers, exhibiting or resulting in a deliberate indifference to the Fourth Amendment protected constitutional rights of persons in Colorado Springs, which was the moving force behind and proximately caused the violation of Mr. Metzler's constitutional rights.

136.    Defendant Colorado Springs failed to properly train and supervise its employees with regard to the probable cause requirement for lawful arrests.

137.    In light of the duties and responsibilities of those law enforcement officers that participate in providing safety and security for citizens and arrestees, as well as CSPD's history of arrests lacking the support of probable cause, the need for specialized training and supervision was so obvious, and the inadequacy of training and/or supervision was so likely to result in the violation of constitutional rights such as those described herein, that Defendant Colorado Springs consciously or deliberately chose to disregard this risk of harm in in deliberately choosing not to provide additional or better training to officers .

138.    The inadequate training and supervision provided by Defendant Colorado Springs resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Colorado Springs.

24

**EXHIBIT A**

139. If any training was given to each Defendant Officer concerning civil rights of arrestees to be free from Fourth Amendment violations, Defendant Colorado Springs knew or should have known that such training was reckless or grossly negligent and that misconduct in that area was almost inevitable.

140. Defendant Colorado Springs has a duty to protect the constitutional rights of the members of the public from violations of those rights by members of its Police Department.

141. Defendant Colorado Springs knew, or should have known, that dangerous consequences could be suffered by individuals (including Mr. Metzler) by failing to properly train and supervise its employees. Defendant Colorado Springs could have and should have pursued reasonable methods for the training and supervising of such employees, but failed to do.

142. Therefore, Defendant Colorado Springs set in motion a series of events that it knew would cause an individual in a similar situation as Mr. Metzler to be deprived of the constitutional right to be free from unlawful seizure. But for the above acts or omissions of Defendant Colorado Springs, Mr. Metzler would not have been subjected to a violation of his constitutional rights, and such a deprivation was a natural and foreseeable consequence of these acts and omissions.

143. As a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice described above, Mr. Metzler has suffered and continues to suffer humiliation, lost earnings, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

144. In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages because the actions of Defendants were taken

**EXHIBIT A**

maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of
Plaintiff.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth Amendment Violation – Malicious Prosecution**

145.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set
forth herein.

146.    At all times relevant to the subject matter of this Complaint, Defendant Officers
were acting under color of state law in their capacities as officers with CSPD and within the
scope of their employment.

147.    Defendant CSPD Officers concealed or misrepresented material facts to the
prosecutor, whose judgment was thereby influenced by these misstatements, and Defendant
CSPD Officers continued to conceal material facts throughout the period of time during which
the charges against Mr. Metzler were pending.

148.    Defendant CSPD Officers' misrepresentations thereby caused the District
Attorney to file charges against Mr. Metzler and cause the continued prosecution of Mr. Metzler.

149.    No probable cause supported Mr. Mezler's original arrest, confinement, or
prosecution.

150.    Defendant Officers were motivated by a motive other than a motive to bring to
justice a person thought to have committed a crime; namely, the purpose of diverting attention
from their own failure to arrest Rick at the Sonesta ES Suites.

151.    Defendants CSPD Officers acted with malice in concealing or misrepresenting
facts material to the charges against Mr. Metzler and his continued prosecution.

152.    Defendant CSPD Officers made the above actions and omissions knowingly,
maliciously, willfully and wantonly.

**EXHIBIT A**

153.     Defendant CSPD Officers' conduct violated clearly established rights belonging to Mr. Metzler of which a reasonable person in their positions knew or should have known.

154.     As a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Mr. Metzler has suffered and continues to suffer humiliation, lost earnings, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

155.     The charges against Mr. Metzler resulting from the actions/omissions of Defendants described herein were dismissed; thus, the original action against Mr. Metzler terminated in his favor.

156.     In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages because the actions of Defendants were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

## VI.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against the Defendants, and grant:

(a)     Appropriate declaratory and other injunctive and/or equitable relief;

(b)     Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(c)     All economic losses on all claims allowed by law;

(d)     Punitive damages on all claims allowed by law and in an amount to be determined

**EXHIBIT A**

at trial;

(e)     Attorney's fees and the costs associated with this action, including but not limited to costs for expert witness fees, to the fullest extent allowed by law;

(f)     Pre and post-judgment interest at the lawful rate; and

(g)     Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 17th day of April 2019.

KILLMER, LANE & NEWMAN, LLP

*s/ David Lane*
David A. Lane
Liana Orshan
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000

*Attorneys for Plaintiff*

**EXHIBIT A**