# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

SASHA CRONICK,

     Plaintiff,

v.

THE CITY of COLORADO SPRINGS, a municipality,
CHRISTOPHER PRYOR, in his official and individual capacity,
ROBERT MCCAFFERTY, in his official and individual capacity,
DANIEL LAMBERT, in his official and individual capacity,
MICHAEL INAZU, in his official and individual capacity

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Sasha Cronick by and through her attorneys David A. Lane of KILLMER, LANE & NEWMAN, LLP, and Tyrone Glover of STIMSON STANCIL LeBRANCHE HUBBARD, LLC respectfully allege for her Complaint and Jury Demand as follows:

### INTRODUCTION

Plaintiff Sasha Cronick never imagined that one of her most heroic moments would become one of her most painful. After Ms. Cronick helped a young man survive an overdose by calling 911 and guided another person in performing CPR which saved the young man's life, Defendants pursued, harassed, grabbed and arrested Ms. Cronick all because she declined to give them her contact information. When she declined to tell officers where she lived and asked for a supervisor, Defendants manhandled, assaulted, arrested and prosecuted Ms. Cronick.  Instead of disciplining its officers for this obvious violation of the

1

EXHIBIT 1

Fourth and Fourteenth Amendments, Colorado Springs condoned their actions in arresting her without probable cause to believe she had violated any law. This unlawful action is fully in conformity with the custom, practice and policy of Colorado Springs police officers.

This is an action for damages against Defendant the City of Colorado Springs, and Defendants Christopher Pryor, Robert McCafferty, Daniel Lambert and Michael Inazu, all members of the Colorado Springs Police Department.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331. This action is authorized and instituted pursuant to 42 U.S.C. § 1983. Jurisdiction supporting Sasha Cronick's claims for attorney's fees and costs is conveyed by 42 U.S.C. § 1988.

2.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391.

## PARTIES

3.      Plaintiff Sasha Cronick was and is a citizen of the United States and State of Colorado during the relevant times described herein.

4.      At all times relevant to the allegations of this Complaint, all individual Defendants were police officers for the City of Colorado Springs and are citizens of the United States and residents of the State of Colorado.

5.   Defendant Colorado Springs is a municipality and is a proper party under § 1983.

6.      All Defendants acted under color of state law at all times relevant to this Complaint.

2

**EXHIBIT 1**

## FACTUAL ALLEGATIONS

7.      On December 12, 2018, Sasha Cronick was leaving her home in Southeast

Colorado Springs to take her husband to work. Ms. Cronick was temporarily living in a motel.

8.   Ms. Cronick had recently recovered from significant medical procedures related to

giving birth after a difficult pregnancy just months earlier.

9.   Unfortunately the motel was occupied by many illicit drug users who would come

and go at all hours of the day and night.

10. That morning, as Ms. Cronick and her husband were leaving the motel, a frantic

neighbor shouted out to them that her boyfriend was overdosing on drugs and not breathing. Ms.

Cronick sprang into action.

11. She darted across the hotel complex parking lot in order to help in any way she could.

She found a frightened young woman next to a man lying seemingly lifeless on the concrete. The

terrified young woman was desperate to save her friend but had no idea what to do.

12. Ms. Cronick documented her encounter on her cell phone.

13. Ms. Cronick called 911 and began coaching the young woman through the steps of

CPR—instructing her on when to breathe and for how long, counting the chest compressions.

Ms. Cronick offered words of encouragement, telling her, "you're doing a great job" and "you're

breathing for him." She was steadfast in making sure the young woman rendered the appropriate

aid – "Don't stop! You've got to breathe for him."

14. Ms. Cronick took instructions from the 911 operator, passed those instructions along

to the young woman, and kept the 911 operator informed as to what was going on. As shown on

the cell phone video, the 911 operator praised Ms. Cronick, telling her what she was doing was

"excellent."

**EXHIBIT 1**

15. Eventually, the apparently-lifeless man began to breathe again. The 911 operator commended Ms. Cronick, telling her "you did a great job today."

16. When paramedics arrived, they immediately began rendering aid to the overdosing party. Police officers also responded to the scene and began investigating.

17. Ms. Cronick remained off to the side of the scene with her cell phone recording. She was not blocking the paramedics from doing their jobs and she was not obstructing the officers' investigation. No officer or paramedic asked Ms. Cronick to move out of the way.

18. Defendant Pryor arrived on scene with Officer Lambert, a rookie officer in training.

19. Defendant Pryor almost immediately engaged in conversation with Sasha Cronick and learned she was the person who called 911. He asked Ms. Cronick for her name, date of birth and a description of what happened; she responded to his inquiry and provided the requested information about herself and the parties involved.

20. When asked for the room number in which she was staying, Ms. Cronick responded in a calm and reasoned tone that she was uncomfortable answering and was not going to provide that information to the officer. Defendant Pryor, on video, evinced clear frustration that Ms. Cronick refused to give him the requested information.  He then commanded her to leave while simultaneously attempting to grab Ms. Cronick by the arm. Ms. Cronick immediately pulled away and loudly told Defendant Pryor not to put his hands on her.

21. As she walked away, Defendant Pryor pursued her to the middle of the motel parking lot. Defendant Pryor had no reasonable suspicion to believe Ms. Cronick had committed, was committing or was about to commit any crime.

22. In the middle of the motel parking lot and well outside the of range of the scene, not obstructing the investigation or the rendering of aid, Defendant McCafferty approached Ms

4

**EXHIBIT 1**

Cronick. Both Officer Pryor and Defendant McCafferty continued to confront, pursue and engage with Ms. Cronick without probable cause or reasonable suspicion to believe she had committed any crime.

23. Ms. Cronick asked for Defendants Pryor and McCafferty's supervisor. They responded by grabbing Ms. Cronick, throwing her to her knees and then pushing her face down onto the concrete before handcuffing her causing her extensive pain. This arrest of Ms. Cronick was without probable cause or reasonable suspicion to believe she had committed any violation of the law.

24. While on the ground, Ms. Cronick was unlawfully and forcibly searched by Defendants.

25. Sasha Cronick was placed in the back of a police cruiser and interrogated by Defendant Pryor. She was eventually formally arrested.

26. At no time was Ms. Cronick resisting any lawful commands of any Defendant officer.

27. At no time did Ms. Cronick act physically aggressively towards officers, assault any officer, resist arrest, or engage in any conduct which would have justified Defendants Pryor or McCafferty's use of force against her or her arrest.

28. At no time was Sasha Cronick engaged in any unlawful activity.

29. Later, supervising officer Defendant Sergeant Michael Inazu responded to the scene and commenced what should have been an objective investigation of what transpired.

30. Defendant Inazu allegedly viewed the body camera footage which clearly showed Defendants Pryor and McCafferty assaulting, detaining, and arresting Ms. Cronick without probable cause or reasonable suspicion.

**EXHIBIT 1**

31. Defendant Inazu interviewed Ms. Cronick and her husband, whose versions of events were consistent with what was on the body camera footage. Despite knowing that Ms. Cronick had committed no crime, having personally seen the video, Defendant Inazu elected to cite and summons Ms. Cronick for failure to desist or disperse.

32. Ms. Cronick pleaded not guilty to the charge of failure to desist or disperse.

33. Ms. Cronick was under intense emotional distress as a result of pending baseless criminal charges against her.

34. She ultimately went to trial in front of a jury of her peers. Notwithstanding, late discovery, evasive testimony, and other tactics by the prosecution, Sasha Cronick was acquitted of all charges.

## MONELL LIABILITY OF COLORADO SPRINGS

35. All of the acts described herein were done by the Defendants intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Ms. Cronick's federally protected rights, and were done pursuant to the preexisting and ongoing deliberately indifferent custom, policy, practice, training, and supervision of Defendant Colorado Springs acting under color of state law.

36. Defendants' treatment of Ms. Cronick was pursuant to Defendant Colorado Springs' customs and/or practices of unlawful conduct, including but not limited to:

    a.  Arresting and prosecuting individuals without probable cause to believe they have committed any crime;

EXHIBIT 1

b. Stopping, detaining, citing, and prosecuting individuals for engaging in speech activity that is critical of Colorado Springs and its agents and/or deemed offensive;

c. Using force against individuals who exercise their free speech rights to criticize CSPD officers and/or record CSPD activity;

d. Maliciously prosecuting individuals without probable cause and, particularly, engaging in malicious prosecutions in an attempt to cover-up police misconduct; and

e. Failing to discipline officers, or even find officers engaged in wrongdoing, in the face of obvious constitutional violations.

37. Upon information and belief, Defendant Colorado Springs has provided no additional training to Defendants and its other officers related to the incident with Ms. Cronick and has therefore ratified this misconduct.

38. The unlawful conduct of Defendants, as set forth in detail herein, amounts to a custom and widespread practice, even if not authorized by written law or express municipal policy, so permanent and well settled as to constitute a custom or usage with the force of law.

39. Through the Defendant Colorado Springs' continuous ratification of unconstitutional detentions, arrests, prosecutions, excessive force, and stifling of free speech, Defendant Colorado Springs has condoned Defendant's conduct.

40. Defendant Colorado Springs failed to properly train and supervise its employees to avoid inhibiting free speech and the use of excessive force, unlawful seizure, and unlawful search.

**EXHIBIT 1**

41. Defendant Colorado Springs knew, or should have known, that its employees would retaliate against Ms. Cronick's free speech, fail to use reasonable force, unlawfully seize, arrest, and prosecute Ms. Cronick, and unlawfully search Ms. Cronick, violating Ms. Cronick's constitutional rights.

42. Defendant Colorado Springs was deliberately indifferent to Plaintiff's constitutional rights, because Colorado Springs knew that individuals in Plaintiff's position would be at a substantial risk of suffering dangerous consequences from Colorado Springs' failure to properly train and supervise its employees.

43. Defendant Colorado Springs could have and should have pursued reasonable methods for the training and supervising of such employees but failed to do so.

44. Defendant Colorado Springs' policies, customs, or practices in failing to properly train and supervise its employees were the moving force and proximate cause of the violation to Ms. Cronick's constitutional rights.

45. The custom, policy, and practice of Defendant Colorado Springs of encouraging, condoning, tolerating, and ratifying the retaliation, detention, use of excessive force by law enforcement officers and the unlawful seizure, search, and false arrest of citizens, as described herein were the moving force behind, and proximate cause of, the violation to Ms. Cronick's constitutional rights.

46. The acts or omissions of Defendant Colorado Springs caused Ms. Cronick damages in that she suffered physical and mental pain, among other injuries, damages, and losses.

**EXHIBIT 1**

47. The actions of Defendant Colorado Springs as described herein deprived Ms. Cronick of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused her other damages.

**Defendant Colorado Springs has a custom and practice of arresting individuals in retaliation for their exercise of their First Amendment rights, particularly in response to criticism and monitoring of police activity.**

48. CSPD has a history of retaliating against individuals who protest police officers and/or record their misconduct—an issue that should have long since been addressed by Defendant Colorado Springs. The following cases show that at the time of Ms. Cronick's arrest, there was an informal custom and practice, that was known to Defendant Colorado Springs, of retaliating against individuals who protest police officers and/or record their misconduct. These cases also illustrate an obvious need, that Defendant Colorado Springs was aware of at the time of Ms. Cronick's arrest, for Defendant Colorado Springs to provide further training to CSPD officers on the necessity of not retaliating against individuals who protest police officers and/or record their misconduct.

49. On July 4, 2013, Grant Bloomquist was arrested without probable cause after he verbally protested two CSPD officers' beating of another man outside of a nightclub. Mr. Bloomquist walked outside of Cowboys Night Club in downtown Colorado Springs and saw officers brutally beating a black man, so he stepped to about 7 feet away and said, "get the fuck off him." At at that point, he was blindsided and struck by an officer, who hit him right in the face. Multiple CSPD officers then struck Mr. Bloomquist repeatedly in the groin area with knee strikes and pinned him against a police vehicle.

9

**EXHIBIT 1**

The officers then threw him in the police car and arrested him. These actions were taken by CSPD officers solely because Mr. Bloomquist was protesting police misconduct.

50. On March 25, 2015, CSPD officers unlawfully arrested and brutalized Ryan Brown because he filmed a traffic stop, protested CSPD officers' misconduct during that traffic stop, and asserted his rights. Mr. Brown was in the passenger seat of a vehicle that was pulled over because his brother (the driver of the vehicle) and himself were black men driving through a predominantly white neighborhood in Colorado Springs. Once CSPD officers initiated the stop, Mr. Brown immediately asked them why the vehicle had been pulled over and started filming. In response to this free speech activity, the CSPD officers held Mr. Brown at gunpoint, forced him out of the vehicle, slammed him into a snowy parkway, and stopped his recording. Mr. Brown filed a lawsuit against Colorado Springs. Colorado Springs settled Mr. Brown's claims against the officers and itself.

51. On November 2, 2017, Terrell Clayton was arrested for simply filming police activity in Colorado Springs and protesting police officers who attempted to intimidate him into taking actions he was not legally required to take, namely providing CSPD officers with identification. On that day, Mr. Clayton drove to the Colorado Springs Police Department substation at 7850 Goddard Street, Colorado Springs, Colorado. Mr. Clayton set out to film officers, and the station itself, for his YouTube channel. To do so, he carried with him a handheld camera and his cellphone. Mr. Clayton was filming outside of the substation when he was approached by two Colorado Springs police officers, Officer Steve Pugsley and Sergeant Brad Pratt. When they approached Mr. Clayton, the officers almost immediately asked Mr. Clayton for identification. Mr.

EXHIBIT 1

Clayton politely refused, correctly informing the officers that they needed reasonable suspicion that he had committed a crime in order to demand identification from him. One officer responded that the officers had reasonable suspicion that Mr. Clayton had committed a crime because he was "outside of a law enforcement facility acting suspicious." He falsely told Mr. Clayton that acting "suspicious" meets the elements of the crime of disorderly conduct. They then told Mr. Clayton that he was "required" to identify himself. Mr. Clayton told the officers that he had a constitutional right to record police activity and that he would not produce identification without reasonable suspicion that he had committed a crime. Immediately after Mr. Clayton's assertion of his rights, the officers forcibly detained him. They aggressively searched Mr. Clayton and seized his camera, placing it on the trunk of the police car. The officers then placed Mr. Clayton in the back of their police car. While in the back of the police car, Mr. Clayton began filming on his cell phone. As one of the officers was speaking to Mr. Clayton, while Mr. Clayton was detained against his will in the back of the police car, the officer falsely told Mr. Clayton that his detention was a *Terry* stop. The officer then seized Mr. Clayton's cell phone and stopped his recording. Unbeknownst to the officers, Mr. Clayton's camera (which had been seized initially by the officers and placed on the trunk of their police car) was continuing to film. On film, the officers stated that, if Mr. Clayton didn't provide his identification, they were going to book him into jail. Sergeant Pratt then told the other officers that he didn't want to hear Mr. Clayton "barkin' laws and all that." Sergeant Pratt then, seemingly knowing that his detention of Mr. Clayton was unconstitutional, told the other officers that "if this ends up going to the court bullshit... then literally fuck my life." Sergeant Pratt then told

**EXHIBIT 1**

Officer Pugsley to "keep him detained out here." The officers eventually told Mr. Clayton that he had a choice: either provide his name and identification or spend the evening in jail. Despite his belief that the officers had no reasonable suspicion to require him to produce identification, Mr. Clayton eventually provided the officers with his identification so as to avoid spending the night in jail. He was then released with no citation. Mr. Clayton has never been cited, or charged, with any crime arising out of the incident on November 2, 2017.

52. In 2016 and 2017, Colorado Springs, and its officials (including its City Council and City Attorney), retaliated against Leslie Weise for blowing the whistle on a government entity engaged in the slow-poisoning of Colorado Springs' residents. Initially, Ms. Weise was simply attempting to learn if the municipally owned and operated power plant near her son's school was emitting unsafe levels of pollution, as all of the existing data available to the public at that time indicated was the case. In an effort to learn what information Colorado Springs possessed about the Martin Drake Power Plant's pollution, she filed an open records request, seeking any studies that would detail whether Colorado Springs Utilities knew whether the Martin Drake Power Plant was in compliance with standards set out by the Environmental Protection Agency. Instead of providing Ms. Weise with just such a report (which was in their possession having been recently commissioned and received from their contracted air quality services vendor), Colorado Springs has covered up and buried the report while issuing a blanket denial of her request for the public information. Doggedly, Ms. Weise pursued the release of these records through the state courts. After having her request denied again at the district court level, Ms. Weise appealed the ruling. During the

**EXHIBIT 1**

appeal, the clerk for the Colorado Court of Appeals sent Ms. Weise the record on

appeal. As she was observing the documents sent by the clerk, Ms. Weise noticed an air

quality report that turned out to be the report she had been seeking all along. She also

noticed that the report confirmed her suspicions: the Martin Drake Power Plant was

determined to be violating the Environmental Protection Agency's National Ambient

Air Quality Standard for sulfur dioxide pollution and was emitting this pollution in an

area where Ms. Weise's child attended school, among other areas where many people

were being exposed to unsafe air quality. Recognizing that the Clerk of the Court of

Appeals may have mistakenly sent her the very report Defendant Colorado Springs was

attempting to hide from the public, Ms. Weise immediately sought guidance from the

Court of Appeals to determine what she should do with the additional records. The

Colorado Court of Appeals' order required that both parties return the disc they had

been mailed. Ms. Weise was further ordered to not distribute the sealed material, nor

download, retain, or disseminate the record. The Colorado Court of Appeals did not

order that Ms. Weise could not discuss the sealed material or share any publicly filed

motions she had submitted. Ms. Weise then contacted the Colorado Springs Gazette.

She shared the motions she had filed when seeking clarification on what to do with the

additional documents. Based on these motions and comment provided by Ms. Weise, the

reporter published a story exposing the Martin Drake Power Plant as a public nuisance

that was actively harming Colorado Springs residents by emitting unsafe levels of

pollution. Importantly, Ms. Weise did not share the documents she had received from

the clerk with the reporter, or anyone else subsequent to the Court of Appeals' orders.

In response to the Colorado Springs Gazette article, Colorado Springs began a campaign

**EXHIBIT 1**

of retaliation against Ms. Weise, simply because she legally spoke out on a matter of important public concern. Over the next six months, one or more Colorado Spring City Council members stated publicly that Ms. Weise's statement regarding the emissions at the Martin Drake Power Plant were lies. Another City Council member stated that Ms. Weise committed a crime when she disclosed the information about the harmful emissions at the Martin Drake Power Plant, and that she knew she was committing a crime when she did so. A spokeswoman for Colorado Springs Utilities also defamed Ms. Weise, stating that she violated the law. Colorado Springs continued retaliation culminated in March and April 2017, when the Colorado Springs City Council voted to take formal action to seek that Ms. Weise be disciplined with the professional associations in the multiples states outside of Colorado Ms. Weise had been admitted to practice law and presently holds (or previously held) professional licensure, accusing her of professional misconduct and violations of the law. The City Attorney herself, Wynetta Massey, sent these complaints using taxpayer resources and on official Colorado Springs letterhead. Each one of these actions were undertaken to retaliate against Ms. Weise for legally and rightly speaking out on a matter of public concern. All told, this campaign against Ms. Weise has cost Colorado Springs taxpayers at least one hundred thousand dollars in public funds.

53. Several of these representative cases resulted in the City of Colorado Springs paying hundreds of thousands of dollars to settle retaliation claims, yet the facts surrounding Ms. Cronick's case make apparent that the Colorado Springs Police Department has yet to learn its lesson and adequately train its officers on the requirements of the First Amendment.

EXHIBIT 1

**Defendant Colorado Springs has a custom and practice of arresting individuals without probable cause and hanging prosecution over their head for months, despite being aware of obvious evidence that no probable cause for arrest exists.**

54. CSPD has a history of making arrests without probable cause—an issue that should have long since been addressed by the City of Colorado Springs. The following cases show that at the time of Ms. Cronick's arrest, there was an informal custom and practice, that was known to Defendant Colorado Springs, of wrongfully arresting individuals without probable cause and condoning such arrest by CSPD officers. These cases also illustrate an obvious need, that Defendant Colorado Springs was aware of at the time of Ms. Cronick's arrest, for Defendant Colorado Springs to provide further training to CSPD officers on the necessity of establishing probable cause before making an arrest.

55. On August 9, 2017, Colorado Springs Police Department officers lured a man suspected of soliciting sex with underage girls to a hotel in Colorado Springs as part of a joint sting operation with Homeland Security Investigations. The officers intended to arrest the man, identified as "Rick" (last name unknown), when he arrived at the hotel and confirmed his intent to purchase sex with an underage girl. When he arrived at the hotel, Rick spoke with undercover detective Elizabeth Reid about purchasing sex with the detective's "16-year-old sister." Despite multiple officers observing the conversation and Rick's truck, police failed to identify or arrest Rick, who walked away from the hotel after apparently sensing something awry with the transaction. Through a combination of failures on the part of Defendants to follow their own procedures, perform a minimally diligent investigation, or apply common sense, CSPD ultimately misidentified Rick as Mr. Metzler herein simply because Mr. Metzler at one time years

15

EXHIBIT 1

earlier had an old phone number which matched that of Rick. Mr. Metzler had not used that phone number, however, for several years. Mr. Metzler was also tentatively identified in a Facebook posting as "Rick" by a detective, despite having little actual resemblance to Rick. Defendants then misrepresented evidence to a judge in order to acquire an arrest warrant for Mr. Metzler. Mr. Metzler was arrested and jailed for approximately three days on two felony sex crime charges. Though he and his legal representatives offered copious exculpatory evidence to demonstrate his innocence, including an alibi backed by GPS evidence, Defendants refused to admit their mistake. The charges against Mr. Metzler were not dismissed until February 12, 2018, over five months after he was arrested.

56. On January 26, 2012, John Sturgis was arrested without probable cause and subjected to excessive force by CSPD officers after a civilian witness misidentified Mr. Sturgis as a homicide suspect. The witness told CSPD officers that he had seen a man at a gas station—Mr. Sturgis—who resembled a homicide suspect, and the officers followed Mr. Sturgis and arrested him. Though Mr. Sturgis was not the homicide suspect, was approximately twice the estimated age of the suspect (20), and was bald while the suspect was described as having hair (among numerous other physical dissimilarities), the officers still elected to arrest him without any cause to believe that he was the suspect. Mr. Sturgis surrendered peacefully and asked the officers not to handcuff him behind his back because he had recently had surgery on his shoulder; he even offered to show the officers MRI images of his injured shoulder that were sitting on his front seat as proof. The officers ignored Mr. Sturgis's pleas, and roughly handcuffed him by the back, causing Mr. Sturgis to reinjure his shoulder and require

**EXHIBIT 1**

further surgery. Several officers falsified their reports about the incident in an unsuccessful effort to invent probable cause to arrest Mr. Sturgis.

57. On October 12, 2012, CSPD wrongfully arrested Ethan Pace for sexual assault after the lead detective omitted critical exculpatory evidence from the arrest warrant affidavit, despite being fully aware of such evidence.

58. On July 21, 2012, James Sorensen was arrested without probable cause for violating a law banning guns in parks; that law had been repealed in 2003. CSPD officers unlawfully detained, handcuffed, and arrested James Sorensen for carrying a holstered pistol at a festival. A Colorado Springs spokeswoman publicly admitted that Mr. Sorensen was correct, and the officers were "in the wrong, definitely." After Mr. Sorensen brought suit to vindicate his constitutional rights, Colorado Springs settled the case.

59. Also in 2012, the City of Colorado Springs settled claims that two CSPD officers had conspired to falsely charge, falsely arrest, and maliciously prosecute one of the officers' ex-boyfriends, a Jarrott Martinez. Despite Mr. Martinez's presentation of a video-supported alibi for the time period when he was accused of the false charges, CSPD supported his prosecution through two criminal trials.

60. In 2009, Joseph Martinez was arrested after a CSPD officer misidentified him as the individual who had sold him drugs during an undercover operation. The officer knew the drug dealer to be nicknamed "Casper," and searched for mugshots of individuals associated with that nickname. He incorrectly selected Mr. Martinez's photograph. When Mr. Martinez turned himself in and professed his innocence, officers made no effort whatsoever to confirm the bad identification that had led to the arrest,

EXHIBIT 1

even though Mr. Martinez lacked the only identifying mark of which the undercover officer had taken note, a tattoo on his shin. Mr. Martinez spent approximately 40 days in jail before he could bond out, and his case was ultimately dismissed for lack of evidence.

61. Also in 2009, CSPD officers illegally detained Evan Bank and searched his home of Evan Bark after misidentifying him as a suspect in an armed robbery. Mr. Bark is Caucasian; the officers were investigating a robbery committed by two men who had been described as African-American. The only connection between the robbery and Mr. Bark was a statement from a witness who had followed a car near the scene of the robbery believing that the car was involved in the robbery; that car was Mr. Bark's vehicle, and the witness had noted his license plate number. However, the witness specifically stated to the investigating CSPD detectives that the car she had seen was not involved in the robbery, as the involved vehicle had tinted windows and Mr. Bark's vehicle did not. Nonetheless, on the basis of this witness statement that was plainly insufficient to establish probable cause, officers warrantlessly searched Mr. Bark's home and vehicles and detained him in handcuffs for several hours.

62. Several of these representative cases resulted in Colorado Springs paying hundreds of thousands of dollars to settle false arrest claims, yet the facts surrounding Ms. Cronick's case make apparent that the Colorado Springs Police Department has yet to learn its lesson and adequately train and supervise its officers on the probable cause requirement, or ensure that the clear ongoing custom and practice of disregarding the probable cause requirement ceases.

**EXHIBIT 1**

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*42 U.S.C. § 1983 – Fourth Amendment*
*Excessive Force*
(Against Defendants City of Colorado Springs, Pryor, McCafferty, and Lambert)

63. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

64. At all times relevant to this Complaint, Defendants were acting under the color of law.

65. When Defendant Pryor grabbed Sasha Cronick and pushed her towards the middle of the motel parking lot, there was no probable cause (or reasonable suspicion) to believe that Ms. Cronick had committed any crime. Ms. Cronick was unarmed, not fleeing from Defendants or resisting arrest in any way, and was not a threat to the officers or any other person. Ms. Cronick suffered significant pain as a result of Defendants' objectively unreasonable and unnecessary use of force.

66. At the time when Defendants Pryor and McCafferty grabbed Sasha Cronick, pushed her onto her knees and then face down on the concrete in the middle of the motel parking lot, handcuffed and forcibly searched her, there was no probable cause (or reasonable suspicion) to believe that Ms. Cronick had committed any crime. Ms. Cronick was unarmed, not fleeing from Defendants or resisting arrest in any way, and not a threat to the officers or any other person. Ms. Cronick suffered significant pain as a result of Defendants' objectively unreasonable and unnecessary use of force.

19

**EXHIBIT 1**

67. At the time when Defendants Pryor and McCafferty harmed Sasha Cronick, Ms. Cronick's Fourth Amendment right to be secure in her person from unreasonable seizure through excessive force was clearly established.

68. Defendants Pryor and McCafferty's actions, as described above, were motivated by intent to harm Sasha Cronick.

69. Defendants Pryor and McCafferty engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Ms. Cronick's constitutional rights.

70. As a result of Defendants Pryor's and McCafferty's use of excessive force, Sasha Cronick experienced pain and suffering with no justification or excuse in law. The acts and omissions of Defendants Pryor and McCafferty were the moving force behind and proximate cause of Ms. Cronick's pain.

71. None of the Defendant officers, with the possible exception of Defendant Inazu who was not present for the takedown of Ms. Cronick, took reasonable steps to protect Ms. Cronick from the objectively unreasonable seizure through excessive force of the other Defendant officers, despite being in a position to do so. Each is therefore liable for the damages resulting from the objectively unlawful arrest and seizure used.

72. The acts or omissions of the individual Defendants were the moving force behind, and the proximate cause of the serious physical and emotional injuries sustained by Ms. Cronick.

73. Defendant officers were engaged in these acts pursuant to the formal or informal custom, policy and practice of the City of Colorado Springs, which encourages, condones, tolerates, and ratifies the unreasonable seizure through excessive force of its law enforcement officers.

**EXHIBIT 1**

74. This formal or informal custom, policy and practice of the City of Colorado Springs is so permanent and well settled as to constitute custom by the Sergeants (such as Defendant Inazu), Chief of Police and City of Colorado Springs employees with final policymaking authority and has been ratified by such policymakers.

75. The acts or omissions of Defendant City of Colorado Springs caused Sasha Cronick damages, including mental, physical, emotional and economic damages.

76. The acts and inactions of Defendants caused Ms. Cronick's damages in that she suffered physical and mental pain during Defendants unlawful use of excessive force against her, among other injuries, damages, and losses.

**SECOND CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – Fourth Amendment*
*Unlawful Seizure / Unlawful Search / False Arrest*
(Against All Defendants)

77. Sasha Cronick hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

78. At all times relevant to this Complaint, Defendants were acting under the color of law.

79. Defendants did not at any time have probable cause or reasonable suspicion, or any other legally valid basis, to believe that Sasha Cronick had committed or was committing any violation of the law prior to seizing and detaining them and continuing to restrain them.

80. Defendants did not at any time have a reasonable basis for believing that Ms. Cronick was a danger to herself or others.

81. Defendants did not at any time have a warrant authorizing any such search, seizure, and/or detention of Ms. Cronick's body or her belongings.

21

**EXHIBIT 1**

82. Defendants, acting in concert with one another, seized and detained Sasha Cronick and did not allow her to leave.

83. During this seizure and arrest, Defendants detained Ms. Cronick against her will, despite lacking any legally valid basis for their actions.

84. At the time when Defendants arrested Ms. Cronick without probable cause and searched her person without reasonable suspicion, Ms. Cronick's Fourth Amendment right to be secure in her person from unreasonable searches and seizures was clearly established.

85. Defendants violated Ms. Cronick's Fourth Amendment rights by engaging in a false arrest and unlawful seizure that was objectively unreasonable in light of the facts and circumstances confronting them.

86. None of the Defendant law enforcement officers took reasonable steps to protect Ms. Cronick from the objectively unlawful arrest or seizure of the other Defendant officers, despite being in a position to do so. Each is therefore liable for the damages resulting from the objectively unlawful arrest and seizure used by the others.

87. The acts or omissions of the individual Defendants were the moving force behind, and the proximate cause of the injuries sustained by Ms. Cronick.

88. Defendants were engaged in these acts pursuant to the formal or informal custom, policy and practice of the City of Colorado Springs, which encourages, condones, tolerates, and ratifies the false arrest and unlawful seizure of its law enforcement officers.

89. This formal or informal custom, policy and practice of the City of Colorado Springs is so permanent and well settled as to constitute custom by the Sergeants (such as Defendant Inazu), Chief of Police and City of Colorado Springs employees with final policymaking authority and has been ratified by such policymakers.

EXHIBIT 1

90. The acts or omissions of Defendant City of Colorado Springs caused Sasha Cronick damages.

### THIRD CLAIM FOR RELIEF
*42 U.S.C. § 1983 - Fourteenth Amendment - Malicious Prosecution*
(Against All Defendants)

91. All statements of fact set forth previously are hereby incorporated into this claim as though set forth fully herein.

92. Defendants, acting without probable cause, procured groundless charges against Sasha Cronick in order to maliciously bring about Ms. Cronick's criminal prosecution.

93. Defendants, acting knowingly, maliciously, willfully and wantonly, participated in the institution of legal proceedings against Sasha Cronick, including promoting the continued criminal prosecution of Sasha Cronick with knowledge that there were no reasonable grounds to believe that Sasha Cronick had committed any crime whatsoever.

94. Defendants acted knowingly, maliciously, willfully and wantonly by accusing Sasha Cronick of unlawful behavior prior to, and during their unlawful arrest of Ms. Cronick.

95. Without any legal basis to do so, Defendants participated in the malicious prosecution of Ms. Cronick.

96. Defendants were motivated by an improper purpose to punish Sasha Cronick in an effort to divert attention from their own misconduct and to insulate themselves from civil liability.

97. Defendants' conduct violated clearly established rights belonging to Ms. Cronick of which a reasonable person in their positions knew or should have known.

98. Defendants' actions and/or omissions caused, directly and proximately, Sasha Cronick to suffer damages.

EXHIBIT 1

## PRAYER FOR RELIEF

**WHEREFORE**, Sasha Cronick respectfully request that this Court enter judgment in her favor and against Defendants, and grant:

(a)     Appropriate declaratory and other injunctive and/or equitable relief;

(c)     Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(d)     All economic losses on all claims allowed by law;

(e)     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f)     Attorney's fees and the costs associated with this action, including those associated with having to defend against the false criminal charge as well as expert witness fees, on all claims allowed by law;

(g)     Pre and post-judgment interest at the lawful rate; and

(h)     Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated this 20th day of February 2020.

KILLMER, LANE & NEWMAN, LLP

*s/ David A. Lane*
_____
David A. Lane
Killmer, Lane & Newman, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000

**EXHIBIT 1**

dlane@kln-law.com

STIMSON STANCIL LEBRANCHE HUBBARD, LLC

*s/ A. Tyrone Glover*

A. Tyrone Glover
Stimson Stancil LeBranche Hubbard, LLC
1652 N. Downing Street
Denver, CO 80218
720-689-8909
glover@sslhlaw.com
*Attorneys for Plaintiff*

**EXHIBIT 1**