**EXHIBIT A**

**EXHIBIT A**

## Preliminary Report

Prepared BY: Kevin R. Sailor
Sailor Consulting Service, LLC
P.O. Box 21553
Denver, CO. 802218

1

Mr. Gordon Vaughan, Esq.
Vaughan & DeMuro
111 South Tejon, Suite 545
Colorado Springs, CO 80903


Re: Carl Anderson, Plaintiff v.
City of Colorado Springs. Civil Action No. 1:20-cv-02032-KMT
U.S. Federal District Court
District of Colorado


May 7, 2021


Dear Mr. Vaughan,

Per your request, I have reviewed the above noted case for the primary purpose of offering my professional opinions on the actions of the officers involved in this incident and specifically to the use of a TASER Conducted Electrical Weapon (CEW) by Officer Delcore of CSPD.


All of my opinions are offered to a reasonable degree of certainty, based upon my training, education and experience of over 40 years as a law enforcement officer and trainer. My training, education and experience are listed on my Curriculum Vitae, which has previously been provided to you.

Following is a list of materials I have reviewed to form my opinions in this matter:

1. Complaint and Jury Demand
2. Protective Order relating to this case
3. Colorado Springs Police Department case reports 2019-00013726 (Redacted)
4. Deposition transcripts of Julie Olson and Jordyn Marie Bode
5. Body Worn Camera video from Officers Delcore, Eckert and Sergeant Sandoval
6. TASER Event and pulse log download records
7. CSPD Use of Force Report 19-194 by Officer Delcore
8. CSPD Use of Force Report 19-196 by Sergeant Sandoval



**Summary of Incident**

This incident took place on April 17, 2019 at Memorial Central Hospital in Colorado Springs, CO. It began as a radio dispatched call for service to the Colorado Springs Police Department (CSPD) in regards to a young child who had been air lifted to the hospital from a hospital in Woodland Park, CO with serious injuries. The child was believed to be approximately 18 months in age and had possibly been hit or run over by a car. This call was initiated at 9:12 pm.

Sergeant Carlos Sandoval was the first officer to arrive at the hospital and upon learning this involved a motor vehicle, called for the Major Crash Team to respond. At this time the actual location of where the injury occurred was not known.

Officer Vito Delcore was on duty and was a member of the Major Crash Team so he responded to the hospital to assist. Officer Todd Eckert responded as well.

A male who was with the injured child identified himself as the child's grandfather. He told Sgt. Sandoval he didn't know where the incident happened, but thought it happened in Teller County. A second male party, later identified as Carl Anderson Sr. approached Sgt. Sandoval and told him the child's mother was pregnant and experiencing complications. He said Sgt. Sandoval's presence was putting undue pressure on her and wanted him to move out of the hallway away from resuscitation room #3 where the child was located, so she couldn't see him. When Sgt. Sandoval refused to move, Mr. Anderson requested the name and number for his supervisor, which Sgt. Sandoval provided to him.Sgt. Sandoval described Mr. Anderson as angry and staring at him in an angry manner.

At the hospital, the officers were briefed by a Forensic Nurse, Julie Olson, who told them the family was being uncooperative and would not allow her to take photos of the child's injuries nor would any of them explain how the child sustained her injuries. The injuries were described as two skull fractures, two facial fractures and a phenmo thorax on her right side. It should be noted that the fractures all meet the statutory definition of serious bodily Injury under the Colorado Revised Statutes.

Eventually it was determined that the incident where the child's injuries occurred was in Teller County and the Teller County Sheriff's Office would assume the investigation. The Colorado State Patrol was notified by Sgt. Sandoval but they declined to respond due to this reportedly occurring on private property. A Detective/Investigator from Teller Co. S.O. arrived and attempted to ascertain from the family members exactly how and where the injuries occurred. He was identified as Detective Anthony Matarazzo.

Detective Matarazzo was unable to get the family members to talk to him but told the CSPD officers the mother of the child, identified as Carissa Hiteshew had been seen texting on her phone and he believed she had been texting to others a description of how the child was injured. He said he would try to get the family to give him the cell phone so it could be taken as evidence. He said he was familiar with the family, however he was not successful in getting them to voluntarily give him her cell phone. He requested the assistance of CSPD officers in seizing the cell phone. He said the child's father, identified as Carl Anderson Jr, also known as "CJ" had his wife's phone in a back pocket.

When officers entered resuscitation room #3 Officer Delcore tried to grab the phone from CJ's pocket. CJ immediately pulled away from him and told him not to take anything from his pocket. CJ became defensive and refused to give the phone to the officers telling them they didn't have a right to take it. The officers told him they did have a right to take it and again requested the phone. They also requested he step outside in the hallway to discuss the issue but he refused.

CJ instead grabbed onto his daughter's bed and took a stance which indicated he was not going to leave the room.

Officer Delcore described CJ as standing with his chest out, his left hand in a loose fist. His stance was in a  firm, stable athletic stance and he had tension in his voice. His jaw was clenched. These are all pre-fight indicators so Officer Delcore drew his X2 TASER and held it to

his side. CJ saw this and asked "What, you going to do, tase me because I'm not going to give you my wife's cell phone?"

CJ told the officers that his dad was on the phone with the Teller County Sheriff and there was a slight pause. CJ was described by Officer Delcore as having a blank stare on his face and he stared at him and Officer Eckert.

Officer Delcore told CJ he would be arrested for Obstruction if he did not give up the phone. CJ replied he wouldn't be charged with anything as they didn't have the right to take the phone and Officer Delcore told him they did.

Officer Delcore then walked around behind CJ to prevent anyone else from getting injured when they took the phone. There were numerous other people in the room to include the child (later learned by me to be named Charlotte) with the mother in the bed with Charlotte and CJ next to the bed.

When Officer Delcore walked behind CJ, he put up his left arm in the air so Officer Delcore grabbed it with his left hand while holding his TASER in his right hand and placing it in CJ's back (not pointed at him).

Officer Eckert grabbed CJ's right arm but CJ turned toward his body toward Officer Eckert, nearly breaking the grasp that Officer Delcore had on CJ's left wrist.

Officer Delcore then began to push CJ toward the hallway and gave him repeated orders to get out of the room. CJ then suddenly stopped moving toward the door and had his left hand balled into a fist and his left arm was tensed up. Officer Delcore felt CJ trying to pull his arm from Officer Delcore's grip. CJ then turned his body toward Officer Delcore and pulled his left arm toward the front of his body, breaking Officer Delcore's grip.

Officer Eckert was at this time trying to get CJ's right arm behind his back but was struggling to do so. Officer Delcore then took into account the following factors:
CJ was physically and strenuously resisting efforts to control him. He was refusing to give them the cell phone and Officer Delcore feared that he would physically fight with them if not controlled. Officer Delcore then aimed his TASER at CJ's back left shoulder and fired the first cartridge. CJ's upper body became stiff and he yelled out "Mother Fucker!" Shortly after the TASER was fired, Officer Delcore detected an unusual sound being made by the TASER and he recognized it was no longer being effective. The TASER did continue through the automated five-second cycle.

Officer Eckert was able to place CJ's right arm behind his back and then he and Sgt. Sandoval lowered CJ to the floor.

Carl Anderson Sr. then directed his attention to Officer Delcore which caused him to be distracted. Carl Sr. was upset and saying this wasn't right and that they (the officers) were out of control. Officer Delcore pointed his TASER at Carl Sr. and told him to back away or he would be "Tased."

Officer Delcore then directed his attention back to Officer Eckert and Sgt. Sandoval and Detective Matarazzo who were still struggling with CJ, trying to get his hands behind his back. Due to his continued resistance, Officer Delcore feared that CJ would be able to get back on his feet and physically fight them and that someone would get hurt.

CJ continued to physically resist efforts to handcuff him and refused to place his hands behind his back. Officer Delcore then fired a second TASER cartridge, deploying the probes into CJ's

4

upper left leg (back side of thigh). This appeared to be effective, causing Neuro-Muscular Incapacitation (NMI) and the officers were able to get CJ secured in handcuffs. He was then assisted in getting off the floor and was escorted out.

After being medically treated and having the probes removed at the hospital Emergency Room, CJ was taken to the CSPD substation for processing and issuance of a summons.

**TASER Operation**

The X2 TASER is a hand-held, two shot, Conducted Electrical Weapon (CEW). It is manufactured by Axon Enterprises in Scottsdale, AZ which was formerly known as TASER International.

The TASER uses electrical current (albeit at very safe levels for human use) to cause what is termed "Neuro-Muscular Incapacitation, or NMI. It does this via pulsed energy (19 pulses per second) that creates involuntary muscle contractions. In order for this to occur, a completed electrical circuit must take place. The TASER cartridge has two metal probes configured in an over/under format. The probes are connected to the cartridge by fine copper clad steel wires, which have 25 feet of wire coiled into the cartridge.The top probe is positive, the bottom probe is negative. Both probes must make a connection with a conductive surface for an effective use that results in NMI. If only one probe makes the connection, an electrical circuit is not completed and there is no NMI effect.

The probes are propelled by a cylinder of compressed nitrogen inside the cartridge. When the trigger is pulled on the TASER, an electrical charge detonates a primer which then causes the cylinder of compressed nitrogen to be punctured by a hollow pin. The released gasses then propel the darts down range.

The probes do not have to necessarily actually touch or penetrate the skin to make a connection however. The TASER has widely been reported to operate at 50,000 volts. Older versions of the TASER did operate at this level but the newer "Smart" weapons such as the X2 only require up to 4,000 volts to create the needed spark. Voltage is simply the pressure in an electrical circuit and in the case of a TASER is what allows the charge to actually "jump" a gap in space (or clothing) to make a connection. The voltage allows the charge to jump a 2" cumulative gap, or 1" per probe. The 4,000 volts is only generated inside the TASER and there is never that amount of voltage delivered to a target. Once the circuit has been completed, the voltage instantly drops to much lower levels.

Voltage is actually not a very relative metric when determining human safety and electricity. A Vandegraph generator (found in some science museums) can generate millions of volts of electricity but are safe to touch as they operate at very low amperage levels (as does a TASER). They will cause someone with long hair to have their hair stand on end from the static electricity (caused by the pressure of the voltage) but it is harmless and painless.

The TASER brand CEW is the most studied and researched less lethal weapon in existence. There have been a multitude of scientific studies done on it, to include both animal and human research. While it is not risk free, it is generally safe when used as designed and in accordance with training standards of Axon Enterprises.

Agencies that have adopted the TASER have seen dramatic declines in injury rates, both to suspects and officers. It is the only less lethal weapon that has the ability to actually incapacitate a person. All other less lethal weapons rely on pain to gain compliance. While a TASER exposure is painful, that is not what causes the incapacitation effect. It is the NMI or involuntary muscle contraction effect that causes the incapacitation, even if the person is on drugs,

emotionally disturbed or a highly focused, combat trained individual. They may be impervious to the pain effect but can still be incapacitated due to the NMI.

An X2 TASER is considered a "smart" CEW in that it has the ability to detect if there is a completed circuit, or if the energy needs to be increased to create a completed circuit. When there is an incomplete circuit, such as a clothing disconnect or one probe hit, or other resistance detected, the capacitor inside the TASER will ramp up, trying to complete the circuit. In the case of a disconnect, this results in a loud crackling noise which occurred in this incident shortly after the first cartridge was fired. Officer Delcore correctly assessed this noise as an ineffective deployment with some sort of disconnect.

Officer Delcore did not immediately fire the second cartridge but after his distraction by Carl Sr., he assessed the situation that CJ was continuing to resist and was not showing any signs of complying with commands by officers. The event download record shows a 13 second interval from the first cartridge and the second cartridge being fired.

The TASER is most effective when targeting large muscle groups. In both shots, Officer Delcore targeted large muscles in the back and thigh. The back is also the preferred target zone as it avoids the sensitive parts of the body such as chest, face, groin and throat. It is also more likely to be effective due to the large muscle groups located in the back.

**Opinions**

It is my professional opinion, based on reviewing the Officers' reports and viewing the body worn camera video, that the officers involved in this incident were acting in good faith and under color of law when they decided to seize Ms. Hiteshew's cell phone. Detective Matarazzo had developed information that Ms. Hiteshew had been texting someone on her phone, describing the accident involving her young daughter. Due to the seriousness of Charlotte's injuries, and the lack of cooperation by her family in explaining how she received her injuries, this would certainly lead a reasonable police officer to have a reasonable belief of a crime being committed.

The fact that this involved a collision between a motor vehicle and a pedestrian, by definition made this a motor vehicle accident, subject to mandatory reporting to law enforcement under CRS 42-4-1601 through 42-4-1606. Leaving the scene of an accident involving serious bodily injury is a Class 4 felony offense in Colorado. This should have in fact been investigated by the Colorado State Patrol and their decision not to respond and investigate, due to it occurring on private property was frankly a derelict decision.

This is further evidence of a crime being committed as Sgt. Sandoval had contacted both the Colorado State Patrol and the Teller County Sheriff's office and neither agency had any evidence of law enforcement being notified of this accident by Ms. Hiteshew, or anyone else.

The decision by Charlotte's family to transport her themselves to the hospital, instead of calling for EMS could very well have cost her her life. Moving someone with serious injuries such as hers is generally not advisable.

As Officer Delcore articulated in his report, cell phones are capable of being accessed remotely and having their data deleted. It was imperative that any potential evidence be preserved and not seizing the phone immediately could have resulted in a loss of critical evidence. Certainly a search warrant would need to be obtained before actually examining or analyzing the phone but the immediate preservation of the data on the phone would in my opinion, be an exigent circumstance that would permit a warrantless seizure. A search warrant is not required for every

seizure under the 4th Amendment. The courts recognize that to prevent destruction of evidence, warrantless seizures may be necessary.

Had the officers tried to get a search warrant prior to seizing the phone, the data could have easily been deleted before a warrant could be obtained. This entire arrest incident could have been avoided had CJ simply complied with the officers requests to give the phone to them.

The fact that the case was later dismissed by the District Attorney does not change the fact that CJ's actions met the statutory definition of an unlawful act of Obstruction of a Peace Officer. The statute is clear that even if officers are acting illegally (as the plaintiff alleges) it is not a defense as long as the officer was acting under color of his/her official authority. Persons are required by law to submit peaceably to the commands and requests of a Peace Officer.

The fact that Charlotte's family was being uncooperative with authorities led to a judge signing an order giving temporary custody of Charlotte to the Department of Human Services. This was further demonstrated in the deposition testimony of Forensic Nurses Julie Olson and Jordyn Bode. Both nurses indicated the family of Charlotte were uncooperative with them as well and refused to allow them to examine Charlotte or take photos of her injuries. They found comments made that they should leave the room due to tensions rising as threatening. Because of this and the body language displayed by members of Charlotte's family, law enforcement and DHS personnel were notified.

The use of physical control holds by Officer Delcore, Eckert and Sgt. Sandoval were in conformance with generally accepted police practices and procedures. They were trying to gain control of a suspect who was actively and physically resisting their efforts to control him and take him into custody. I saw nothing in the BWC video that would lead me to conclude the officers were acting unlawfully or excessively in their use of force.

The use of the X2 TASER on CJ by Officer Delcore was also in accordance with generally accepted police practices and procedures. It was used to gain compliance with an actively and physically resistive suspect to gain control of him. The TASER was also used according to training practices advocated by Axon Enterprise. It was fired at the preferred target zone and only the number of cycles needed for compliance were used. Each cycle was the standard automatic five-second cycle.  The second cartridge was fired due to the first one becoming ineffective and due to continued resistance by the suspect. There were no extended or continuous cycles delivered.

The TASER Pulse Log graph demonstrates this concept. In the way of explanation, there are three components displayed on the graph. The green triangles represent the voltage which is measured inside the TASER. This does NOT represent the amount of voltage delivered to the target. The purple squares represent what is known as the "Stim" phase of the pulse (as in stimulation). The blue diamonds represent the actual charge delivered and the target output is 63 microcoulombs.

With the first cartridge, the graph shows a completed circuit with 63 microcoulombs being delivered for approximately the first 1.5 to 1.75 seconds. After that there is a disconnect (likely from the probes becoming dislodged and over 2" from the body) which is not unusual when a person is resisting and thrashing about.

The second cartridge shows a solid completed circuit with 63 microcoulombs delivered for nearly the full five second cycle. This was also corroborated by the reaction of CJ who was experiencing NMI during the second cycle and this allowed the officers to get him secured with handcuffs.

I reserve the right to modify/change my opinions should additional information/evidence become known to me.

Respectfully submitted,

*Kevin R. Sailor*

Kevin R. Sailor