**EXHIBIT B**

**EXHIBIT B**



# D.C. Security and Private Investigations



## Dan Corsentino

Private & Investigative Security Consultants        601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

To:

David A. Lane, Reid Allison, and Tyrone Glover
of KILLMER, LANE & NEWMAN, LLP,

From: Dan Corsentino-
Former Elected Sheriff, Former Chief of Police, Former Detention Warden of Pueblo County
Sheriff Office, Subject Matter Expert, Owner of DC Private Investigations and Security
Consultants

REPORT OF

CARL ANDERSEN JR., Plaintiff,

V.

THE CITY of COLORADO SPRINGS, TELLER COUNTY COLORADO, VITO
DELCORE, in his official and individual capacities, TODD ECKERT, in his official and
individual capacities, CARLOS SANDOVAL, in his official and individual capacities,
ANTHONY MATARAZZO, in his official and individual capacities.

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without
permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



## Dan Corsentino

Private & Investigative Security Consultants                601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

## Contents

**SUBJECT MATTER EXPERT** 4

**INTRODUCTION, RETENTION, AND FOCUS** 5

**INFORMATION REVIEWED AND CONSIDERED** 7

**ROLE AND RESPONSIBILITY** 8

**FACT OF THE CASE:** 9

**CONSIDERATIONS** 14
  DUTIES OF LAW ENFORCEMENT OFFICERS DURING AN INVESTIGATION 14
  CIRCUMSTANCES PRIOR TO LAW ENFORCEMENT INVOLVEMENT 15
  LACK OF TACT DURING INVESTIGATION AND DETENTION OF MR. ANDERSEN JR. 16
  CIVIL RIGHTS VIOLATIONS AND EXCESSIVE USE OF FORCE 17
  INVALID CONCERNS REGARDING LOSS OF CELL PHONE DATA 18
  DISPUTING MR. SAILOR'S EXPERT OPINION 19

**INDUSTRY BEST PRACTICES AND EXPECTATIONS** 21
  BACKGROUND INVESTIGATION 22
  FAMILY INTERVIEW: 22
  ADDITIONAL BEST PRACTICES: 22

**CONCLUSION** 25

**CURRICULUM VITAE** 31
  **PREVIOUS EXPERIENCE – EXPERT WITNESS TESTIMONIAL** 35
  **PUBLICATIONS:** 44
  **FEE SCHEDULE:** 45

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



## Dan Corsentino

Private & Investigative Security Consultants          601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

# SUBJECT MATTER EXPERT

My name is Dan Corsentino. I am submitting this report acting as a subject matter expert regarding the case of Carl Andersen Jr., an individual whose civil rights were violated by the Colorado Springs Police Department and Teller County Sheriff Office.

Attached to this report is a current copy of my Expert Witness disclosures, which includes my Curriculum Vita, fee schedule, and a list of the cases in which I have provided sworn testimony during my career.

I, am a graduate of Harvard University's John F. Kennedy School of Government Senior Executive Management Program in Cambridge, Massachusetts. In addition, I completed the National Federal Bureau of Investigation Law Enforcement Executive Development Seminar in Quantico, Virginia (LEEDS Program 39th Session).

In March of 1993, I graduated from the prestigious National FBI Academy (172nd session) in Quantico, Virginia. At the academy, my fellow colleagues throughout the United States elected me as section representative. I am also a graduate of the School of Police Staff and Command Northwestern University Traffic Institute in Chicago, Illinois.

Additionally, I hold a Master's degree in Public Administration and a Bachelor's degree in Political Science from the University of Colorado. Prior to becoming Sheriff of Pueblo County, I served at the Pueblo County Sheriff's Office as Undersheriff, Detention Facility Administrator, Law Enforcement Captain, Law Enforcement Lieutenant, and Inspector as well as a patrol deputy.

Lastly, since June of 2010, I have been the owner and operator of D.C. Private Investigations, which has been licensed in the State of Colorado. In 2015 my business expanded to conduct site security in Pueblo, Colorado. Currently, my security operation has contracts throughout Southern Colorado and employs 102 people.

4

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



**Dan Corsentino**

Private & Investigative Security Consultants                601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

# INTRODUCTION, RETENTION, AND FOCUS

My name is Dan Corsentino with DC Private Investigations and Security Consultations. I was retained by Killmer, Lane & Newman, LLP to review the materials forwarded to me concerning this case and render my opinions about the facts concerning the seizure of property and arrest of Carl Andersen Jr.

The Case of Carl Andersen Jr., which took place on April 17, 2019, was a preventable systematic failure by the Colorado Springs Police Department and Teller County Sheriff's Department. As a former chief executive law enforcement officer serving in the positions of Chief of Police and Elected Sheriff, the actions of Sergeant Sandoval, Sergeant Matarazzo, Officer Delcore, and Officer Eckhert show a lack of professional training, basic communication, sensitivity/empathy, and a holistic awareness of the environment that they were in. All of these officers were clearly unaware of the Fourth Amendment, which protects citizens from unlawful search and seizure. The actions by these individuals were a direct violation of Carl Andersen Jr.'s Fourth Amendment rights, as there were no exigent circumstances to warrant the Use-of-Force engagement. In addition, I am deeply concerned about a disconnect between the police philosophical leadership ideology of the Colorado Springs Police Department and the lack of alignment within the chain of command as indicated by Sergeant Carlos Sandoval's lack of enforcement of not carrying out the department ideology or the policies and procedures of the Colorado Springs Police Department as a mid-level manager.

The expert that was retained suggested that these officers were acting lawfully , and that their actions should be protected. The antithesis of that statement is true; these officers were not acting lawfully , rather, were acting within the confines of their own personal emotions and judgements. These officers were attempting to rationalize a reason to take a phone, which they had no probable cause to have in their possession under the auspices of an emergency situation. In addition, as will be explored later in this report, there were multiple options available to both Sergeants to utilize given the sensitive situation that they placed themselves in, and inevitably created.

Finally, it is important to note that communication and verbal de-escalation were the tools that would have resolved this situation. The behavior of these officers does not represent best

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



## Dan Corsentino

Private & Investigative Security Consultants                601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

practices as described in this report throughout numerous law enforcement divisions throughout the United States.

As this report is reviewed, it is my hope that situational context coupled with best practices and expectations of law enforcement officers can provide a clear image of how the situation with Mr. Andersen Jr. could have and should have played out. Law enforcement personnel are equipped with various tactics and methods to maintain control over tense situations, meaning that the actions by officers involved in this incident cannot be justified.

Respectfully,

Dan Corsentino

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be u sed without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516

**Dan Corsentino**

Private & Investigative Security Consultants        601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

# INFORMATION REVIEWED AND CONSIDERED

Delcore, V. (2019). *Initial Case Report - Case Report # 2019-00013726.* Colorado Springs: Colorado Springs Police Department.

Delcore, V. (2019). "Delcore_21.06 Bates NO.72." *Colorado Springs Police Department: Body Cam Footage.* Colorado Springs, Colorado.

Eckert, T. (2019). Initial Case Report - Case Report # 2019-00013726. Colorado Springs: Colorado Springs Police Department.

Eckert, T. (2019). "Eckert_1.37.56 Bates NO.73." *Colorado Springs Police Department: Body Cam Footage,* Colorado Springs, Colorado.

IACP National Law Enforcement Policy Center. (2012). Investigating Child Abuse. *IACP National Law Enforcement Policy Center,* 9.

*IX. Criminal Procedure Guidelines & Officers Field Manual: Definitions-4. Probable Cause.* (2017). Colorado Peace Officers Handbook.

Lane, D. & Allison, R. (2021). "Complaint and Jury Demand." *Carl Andersen Jr. v. The City of Colorado Springs, et. al.:* 1:20-cv-02032.

Legal Information Institute. (n.d.). *Exigent Circumstances.* Retrieved from Cornell Law School: https://www.law.cornell.edu/wex/exigent_circumstances#:~:text=1%20Definition.%20Exigent%20circumstances%20-%20%22%20circumstances%20that,...%202%20Overview.%20...%203%20Further%20Reading.%20

Matarazo, A. (2019). "Deputy Report for Incident 19-00738." *Teller County Sheriff's Office:* Woodland Park, Colorado.

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



**Dan Corsentino**

Private & Investigative Security Consultants         601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

Pelton, S. (2021). "Deposition of Jordyn Marie Bode."*Andersen v. The City of Colorado Springs.* Colorado Springs: Pelton Reporting Services.

Pelton, S. (2021). "Deposition of Julie Kay Olsen."*Andersen v. The City of Colorado Springs.* Colorado Springs: Pelton Reporting Services.

Sailor, K. (2021, May 7). *Preliminary Report.* Denver, Colorado: Sailor Consulting Service, LLC.

Sandoval, C. (2019). *Initial Case Report - Case Report # 2019-00013726.* Colorado Springs: Colorado Springs Police Department.

Sandoval, C. (2019). "Sandoval.Carlos_2.20.39 Bates NO.76." *Colorado Springs Police Department: Body Cam Footage,* Colorado Springs, Colorado.

Thompson, G. a. (2009). "Training Key #360: Effective Police Communication." *International Chiefs of Police.* https://www.theiacp.org/sites/default/files/2018-08/630%20Effective%20Police%20Communication.pdf

## ROLE AND RESPONSIBILITY

Carl Andersen Jr. – Plaintiff, AKA CARL Andersen JR.

Carl Andersen Sr. – Plaintiff's Father

Carissa Hiteshew – Carl Andersen Jr.'s Fiancé, mother of child, Charlotte Andersen

Charlotte Andersen – Daughter to Carl Andersen Jr. and Carissa Hiteshew

Sergeant Carlos Sandoval – Colorado Springs Police Department

Officer Vito Delcore – Colorado Springs Police Department Major Crash Team

Officer Todd Eckert - Colorado Springs Police Department Major Crash Team

Detective Sergeant Anthony Matarazzo – Teller County Sheriff's Detective

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



**Dan Corsentino**

Private & Investigative Security Consultants          601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

Jordyn Bode – Memorial Hospital Forensic Nurse

Julie Olson – Memorial Hospital Forensic Nurse

# FACTS OF THE CASE:

On April 17, 2019, a traffic accident occured at 210 Spruce Lane in Woodland Park, Colorado. Carissa Hiteshew was picking up her daughter, Charlotte Andersen, from her fiancé Carl Andersen Junior. While at the home, Charlotte ran behind her mother's vehicle and was accidentally struck by the car[1]. Mr. Andersen and Ms. Hiteshew jumped into action, taking her by car to Pikes Peak Regional Hospital (PPRH) of UC Health[2], which was approximately 10 minutes away from Mr. Andersen's home[3].

Once evaluated at PPRH, the decision was made that Charlotte needed to be transported to Memorial Hospital in Colorado Springs via Flight for Life[4]. She had sustained severe, life threatening injuries; two skull fractures, two facial fractures, and phenom thorax of the right lung[5] were immediately apparent injuries that PPRH staff knew they did not have the ability to treat.

Sergeant Matarazzo of the Teller County Sheriff's Office arrived at Memorial Hospital in Colorado Springs and attempted to make contact with Mr. Andersen Jr. and Ms. Hiteshew. Upon entering the room and requesting to speak with Mr. Andersen and Ms. Hiteshew, he alleges he was met with a refusal to participate in the investigation. He explains to the couple that "based on the refusal to cooperate with the investigation" he would need to take Ms. Hiteshew's cell phone to confirm the information he had received about her texting during the incident and/or after the incident[6]. At this time, he requested backup from the Colorado Springs Police Department.

---

[1] (Lane, D. & Allison, R. 2021).

[2] (Lane, D. & Allison, R. 2021).

[3] (Lane, D. & Allison, R. 2021).

[4] (Lane, D. & Allison, R. 2021).

[5] (Lane, D. & Allison, R. 2021).

[6] (Matarazzo 2019, p.4)

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



**Dan Corsentino**

Private & Investigative Security Consultants          601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

Sergeant Carlos Sandoval with the Colorado Springs Police Department received a call that a child had been transported to Memorial Hospital with severe injuries, possibly from a car accident. The reporting party, Jordyn Bode, Memorial Hospital Forensic Nurse, stated that the family was being uncooperative and not giving any information regarding the child's injuries[7],[8]. In addition to this, she made statements that she felt threatened by the person in the green shirt telling them to leave the room because tensions were high[9]. When reviewing body cam footage, an individual wearing a green in the room shirt is Carl Andersen, Senior[10],[11],[12], meaning that the officers were told the entire family was not cooperating when, in reality, one member of the family asked for the nurses to give the family some privacy in a non-critical moment of the child's care.

Upon his arrival to Charlotte's room at Memorial Hospital, Sergeant Sandoval waited outside the room for a nurse while observing the family through the window to the room[13]. A male, later identified as Carl Andersen Sr., came out of the room and asked if he could help Sergeant Sandoval[14]. According to Sergeant Sandoval's report, he told the male that he did not need any assistance. Immediately, Sergeant Sandoval contradicts himself by asking Mr. Andersen Sr. where the accident happened[15]. Sergeant Sandoval was told the accident occurred in Teller County, but Mr. Andersen Sr. did not know the exact address.[16] He then informed Sergeant Sandoval that Ms. Hiteshew was pregnant, and that his presence was causing her undue stress[17]. Mr. Andersen Sr. asked Sergeant Sandoval to step away from the window. Sergeant Sandoval told Mr. Andersen Sr. that he would not step away from the window.

Mr. Andersen Sr. asked Sergeant Sandoval for his supervisor's phone number, which Sergeant Sandoval provided.[18] Mr. Andersen Sr. called the Sergeant. Sandoval's supervisor from inside

---

[7] (Sandoval, 2019, p. 2)
[8] (Pelton, S, 2021, p. 25)
[9] Peloton, S, 2021, p. 24)
[10] (Sandoval 0:24)
[11] (Delcore 0:29)
[12] (Eckert 0:25)
[13] (Sandodal, 2019, p. 2)
[14] (Sandodal, 2019, p. 2)
[15] (Sandodal, 2019, p. 2)
[16] (Sandoval, 2019, p. 2)
[17] (Sandoval, 2019, p. 2)
[18] (Sandoval, 2019, p. 2)

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be u sed without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



**Dan Corsentino**

Private & Investigative Security Consultants

601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

the hospital room. Because Sergeant Sandoval's body cam was not activated at this time, we are unable to hear or see this interaction. However, we can confirm that Mr. Andersen Sr. called the supervisor, as they are seen speaking on the phone when Sergeant Sandoval re-enters the hospital room (Sandoval 0:17).

In a report prepared by Officer Eckert, he stated that he had talked with an unknown male who told him he was the child's grandfather. This team cannot verify if this was Charlotte's maternal or paternal grandfather. The grandfather understood the child had walked behind a vehicle her mother was backing out of the driveway, run the child over and dragged her under the car. The grandfather told Officer Eckert that the incident happened in Woodland Park and the child had been transported by family to the hospital in Woodland Park, then flown to Memorial Hospital. The grandfather was not aware of any police agency being contacted to conduct an investigation of the incident.[19]

Officer Eckert relayed this information to Sergeant Sandoval. That is when Sergeant Sandoval contacted Woodland Park Police and Teller County Sheriff Office.

After obtaining the address where the incident occurred, Sergeant Sandoval called Woodland Park Police Department to request any information they had on the incident. Woodland Park Police told Sergeant Sandoval that the address he provided was in Teller County; consequently, Sergeant Sandoval contacted the Teller County Sheriff Office and explained what information he had. Teller County Sheriff Dispatch stated they would contact a Detective and have that Detective call Sergeant Sandoval[20]. Sergeant Sandoval also contacted Colorado State Patrol about the accident but was told that they do not investigate accidents on private property[21].

Sergeant Matarazzo of Teller County Sheriff's Department was informed by his dispatch about the incident. Sergeant Matarazzo indicated in his report he was aware that Charlotte had been struck by a car driven by her mother[22]. Sergeant Matarazzo received information from a fellow Commander with the Teller County Sheriff's Office that Ms. Hiteshew was texting an

---

[19] (Eckert, 2019, p. 3)

[20] (Sandoval, 2019, p. 2)

[21] (Sandoval, 2019, p. 2)

[22] (Matarazzo, 2019, p. 3)

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



## Dan Corsentino

Private & Investigative Security Consultants                601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

unnamed friend concerning the accident[23]. Because Sergeant Matarazzo believed that the text could indicate if Ms. Hiteshew had been texting while driving the car at the time Charlotte Andersen had been hit, he felt it was important to access the information on the phone. [24]

Sergeant Sandoval was contacted by Detective Sergeant Anthony Matarazzo with Teller County. Sergeant Matarazzo told Sergeant Sandoval he needed to obtain Mrs. Hiteshew's cell phone, citing that he had been told that Mrs. Hiteshew was texting someone about details of the accident.[25]

Sergeant Sandoval contacted Dispatch and requested additional officers be sent to the hospital to assist in obtaining the cell phone once Sergeant Matarazzo arrived. Officer Vito Delcore and Officer Todd Eckert of Colorado Springs Police Department Officer responded to the call for assistance[26],[27].

Sergeant Matarazzo contacted the Andersen family at Memorial Hospital. Reports indicate that Mr. Andersen Jr. and Ms. Hiteshew were unwilling to cooperate with his investigation, and that Mr. Andersen Jr. had declined the request to hand over his fiancée's cell phone[28]. Because Mr. Andersen Jr. and Ms. Hiteshew would not cooperate with his investigation, Sergeant Matarazzo decided that it was imperative for him to retrieve the Ms. Hiteshew's cell phone[29]. This information was relayed to Sergeant Sandoval, who was waiting outside of the room[30]. Sergeant Matarazzo and Sergeant Sandoval agreed to make entry into the hospital room with Officer Delcore and Officer Eckert as backup.
Upon entry into the room, reports allege that Mr. Andersen Sr. told officers to leave[31]. In reality, it was Officer Eckert who asked Mr. Andersen Jr. to leave the room[32], but only after Officer Delcore reached for the cell phone which was in Mr. Anderson Jr.'s back pocket. Mr. Andersen Jr. asserted himself, telling Officer Delcore to not touch the "anything from [his]

---

[23] (Matarazzo, 2019, p. 4)

[24] (Matarazzo, 2019, p. 3-4)

[25] (Sandoval, 2019, p. 3)

[26] (Eckert, 2019, p 2.)

[27] (Delcore, 2019, p. 2)

[28] (Matarazzo, 2019, p.4)

[29] (Matarazzo, 2019, p.4)

[30] (Sandoval, 2019, p.2)

[31] (Sandoval, 2019, p. 2)

[32] (Eckert 0:31)

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



## Dan Corsentino

Private & Investigative Security Consultants          601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

pockets"[33]. After a few moments of back-and-forth discussion, Officer Delcore pulled his Taser from his holster[34]. Mr. Andersen Jr. questioned Officer Delcore, asking if he was going to tase him over a cell phone. Continuing to discern the situation, Mr. Andersen Jr. asked officers to show him that they had "the right" to take his personal property, essentially asking if they had a search warrant[35]. No one said they had a search warrant, but continued to assert that they had the right to take the phone[36],[37],[38].

After a few moments, Officer Delcore moved behind Mr. Anderson Jr.'s back, telling him that he didn't want anyone behind him to get hurt[39],[40]. As he finishes stating this, he reaches for Mr. Anderson Jr.'s left arm. Following suit, Officer Eckert put his hands on Mr. Andersen Jr.'s right arm[41]. Immediately, Mr. Andersen Jr. tries to pull his arms away, declaring that officers did not have the right to touch him. Officers did not explain to Mr. Anderson Jr. why he was being physically restrained[42],[43]. Releasing his grip, Officer Delcore deployed his Taser, hitting Mr. Andersen Jr. in the left side of his back with the prongs[44],[45]. Mr. Andersen immediately fell to the floor.

Sergeant Sandoval, Officer Eckert, and Officer Delcore tried to place handcuffs on Mr. Andersen Jr. after he had been tased. As he still did not know why officers were there, and now had been placed into a fight or flight situation, Mr. Andersen Jr. was not cooperating with officers attempting to place handcuffs on him[46],[47]. Sergeant Matarazzo grabbed  Mr. Andersen

---

[33] (Eckert 0:23)
[34] (Delcore 0:50)
[35] (Sandoval 2:10)
[36] (Sandoval 1:30-2:10)
[37] (Eckert 1:47-2:27)
[38] (Delcore 0:49 - 1:39)
[39] (Eckert 2:12)
[40] (Declore 2:14)
[41] (Eckert 2:15)
[42] (Eckert 2:15)
[43] (Delcore 2:18)
[44] (Delcore 2:25)
[45] (Eckert 2:23)
[46] (Eckert 2:25)
[47] (Delcore 2:33)

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



**Dan Corsentino**

Private & Investigative Security Consultants

601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

Jr. by the back of the neck with both hands, holding his head to the floor[48]. While trying to maintain control over a situation that he had initiated, Officer Delcore shot Mr. Andersen Jr. in the back of the left leg with the Taser[49]. Officers were able to subdue Mr. Andersen and place handcuffs on him.[50]

Officer Delcore later attempts to justify his actions by stating that "through [his] training and experience, [he knew] that the data on a cell phone can be destroyed remotely from the owner of the cell phone or anyone that has access to the usernames and passwords for the cellphone.[51]" Officer Delcore feared that, unless he obtained the cell phone immediately, that valuable evidence regarding this situation would be lost, as he felt text messages would be deleted and not be retrievable[52].

The next day on April 19, 2019, Sergeant Matarazzo obtained a search warrant for the cell phones belonging to Mr. Andersen Jr. and Ms. Hiteshew. However, he received notice on April 23, 2019 that the cell phones would not have data extracted from them, that the warrant was not going to be served, and that the cell phones would be returned to their rightful owners[53].

## CONSIDERATIONS

In a review of the incident, there are copious opportunities for improvement by law enforcement officers. Beyond the opportunities for improvement, however, are clear and obvious oversight of police best practices and of policies and procedure. It is disturbing, to see the level of disconnect that has developed between the officers involved in this incident and their corresponding departments. Surely, these officers do not represent the morals, ethics, and best practices of police in any department.

### *DUTIES OF LAW ENFORCEMENT OFFICERS DURING AN INVESTIGATION*

---

[48] (Eckert 2:30)

[49] (Eckert 2:38)

[50] (Sandoval, 2019, p. 3)

[51] (Delcore, 2019, p. 4)

[52] (Delcore, 2019, p. 4-5)

[53] (Matarazzo, 2019, p. 4)

14

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



**Dan Corsentino**

Private & Investigative Security Consultants          601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

If Sergeant Sandoval and Sergeant Matarazzo had followed the guidelines set forth by the International Association of Chiefs of Police in conducting an investigation, the entire case would have had a better outcome for all parties involved.

One of the most essential duties of law enforcement is to conduct an investigation to determine if a crime has been committed. This requires an officer to talk with people such as witnesses, victims, and suspects. In addition, officers must observe the crime scene and identify if a victim is involved, and if so- observe the injuries and communicate with medical personnel to determine the severity and expected outcome of the injuries the victim sustained.

As stated above, it is critical for law enforcement to speak with individuals who have information regarding each incident they investigate. Therefore, utilizing verbal skills are critical for a law enforcement professional to be successful in their investigation. In this case, there was a lack of verbal skills, a lack of investigation experience and a jump to conclusion that a cell phone held all the answers.

Equally as important is the collection of evidence. In order to collect evidence within the confines of the law, an officer needs either the cooperation of the people involved, or a search warrant based on probable cause which has been signed by a judge. As I discuss below, exigent circumstances do exist, but the laws and regulations in relation to what qualifies as exigent circumstances are extremely limited. Ultimately, unless exigent circumstances warrant otherwise, people involved in an incident have the right to refuse to cooperate with an investigation.

## *CIRCUMSTANCES PRIOR TO LAW ENFORCEMENT INVOLVEMENT*

UC Health Pikes Peak Regional Hospital should have reported this incident to the Woodland Park Police Department or Teller County Sheriff Office. If Sergeant Matarazzo had been notified of the accident by UC Health Pikes Peak Regional Hospital, then given the information regarding Charlotte's transfer to Memorial Hospital would have allowed him to be the first responding law enforcement officer instead of Sergeant Sandoval, possibly changing the outcome of this scenario.

Once Charlotte was transferred to Memorial Hospital, Forensic Nurse Bode should have reviewed medical information supplied by UC Health Pikes Peak Regional Hospital with the

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be u sed without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



**Dan Corsentino**

Private & Investigative Security Consultants          601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

family. Additionally, when Nurse Bode contacted the Andersen family, she should have explained the procedure in a more concise and professional manner. This might have made the Andersen family feel more at ease about the process that was going to happen. If it had been explained to the Andersen family that Hospital staff were a mandatory reporter to law enforcement of injuries to children that could be considered child abuse, this probably would have changed the outcome of how the Andersen family reacted to the news that law enforcement was going to be contacted. Finally, simply being asked or told to leave a room is not a true reason to feel threatened, so Nurse Bode's judgement regarding this situation is questionable.

The experience of people involved in an investigation determines the amount of cooperation law enforcement officials will receive during the investigation. Mr. Andersen Sr. was involved in politics in Teller County. He ran for County Commissioner but was not elected. In a deposition Julie Olsen, the forensic nurse at Memorial Hospital, Nurse Olson stated that Mr. Andersen Sr. and Mr. Andersen Jr. were concerned about where the information collected by Nurse Olson would be shared. Nurse Olson told both that the information could be shared with Colorado Springs Police and Department of Human Services. When told this, one of the men made a statement to the effect of "yeah, and then the DA's Office will open a case because the state presses charges.[54]" Regardless of if it is justified or not, the Nurses responsibility in this situation is to inform the family of the circumstances and do their best to work within the circumstances.

## *LACK OF TACT DURING INVESTIGATION AND DETENTION OF MR. ANDERSEN JR.*

When Sergeant Sandoval arrived, instead of conducting an investigation by talking to family members in another room, he states in his report that he stood at the door looking into the room. Sergeant Sandoval was asked by Mr. Andersen Sr. to step out of the vision of Ms. Hiteshew, because she was pregnant and dealing with complications[55]. He explained that his presence was causing her stress. Instead of trying to calm the situation, Sergeant Sandoval refused to comply with a reasonable request.

---

[54] (Pelton, 2021, p. 5)

[55] (Sandoval, 2019, p. 2)

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



**Dan Corsentino**

Private & Investigative Security Consultants          601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

When Sergeant Matarazzo contacted the Andersen Family, he did not indicate in his report that he tried to calm the situation down by explaining why law enforcement was involved and what the process was. Instead, he wrote that he called Ms. Hiteshew's cell phone to determine it was the correct number he was told was sending text messages, and to determine where the cell phone was located[56]. Sergeant Matarazzo then requested the cell phone. When it was not given to him, he contacted Sergeant Sandoval with the plan to take the cell phone.

## *CIVIL RIGHTS VIOLATIONS AND EXCESSIVE USE OF FORCE*

This case is remarkable in the fact that if the proper police tactics were used from the beginning in this case, Carl Andersen Jr. would not have been Tased or arrested by Colorado Springs Police.

When Sergeant Matarazzo brought the other officers into the hospital room to take the phone, he did not have a search warrant signed by a judge, consent from the parties or any legally exigent circumstances permitting the seizure. The seizure of the cell phone is a violation of the 4th Amendment rights of Mr. Andersen Jr. and Ms. Hiteshew. As we discuss below, even if the text messages would have been deleted, the information was imprinted on the memory card of the cell phone. This information would have been recovered when a forensic exam was completed on the cell phone.

The arrest of Mr. Andersen Jr. was also a violation of his 4th Amendment rights. Probable cause for his arrest had not been made. Officers said he was being arrested for "Interference of a Peace Officer", but the officers had no right to seize the cell phone. They did not have a search warrant or exigent circumstances, and therefore, used excessive force against Mr. Anderson Jr.

Undoubtedly, the force used to arrest Mr. Andersen Jr., specifically the use of the Taser, was a violation of Mr. Anderson Jr.'s rights also.

Sergeant Matarazzo applied for a search warrant for the cell phones he retrieved from Mr. Andersen Jr. and Ms Hiteshew the day after the incident[57]. He did not include the information detailing how Mr. Andersen Jr. had been Tased to retrieve the cell phones. Information was

---

[56] (Matarazzo, 2019, p. 4)

[57] (Matarazzo, 2019, p. 4)

17

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



## Dan Corsentino

Private & Investigative Security Consultants                601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

supplied that Andersen Jr. was restrained by officers, but it was extremely vague and did not indicate how extreme the use of force used was.

These officers were interfering with the privacy of the family at a critical time when emotions were high. Their 18-month-old baby was lying in a bed, with severe injuries. The family was concerned that they might lose their child.

Exigent circumstances, in this case, can be referred to in relation to the collection of evidence without a warrant due to the concern that said evidence will be irrevocably destroyed. The definition of "exigent circumstances" as described by Cornell Law School explains that:

> "*Circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.*[58]"

Under this definition, the destruction of relevant evidence would be warranted as exigent circumstances. However, as we will discuss below, the concerns exhibited by Officer Delcore were invalid concerns based on inaccurate information and/or bad training. Therefore, this specific case did not have exigent circumstances to warrant the seizure of the cell phones, let alone Mr. Anderson Jr.'s arrest. If the officers would have just watched Mr. Anderson Jr. hold the phone or place it in his back pocket, then start to destroy the phone by stomping on it or burning it, then they would have had the right to immediately seize the cell phone.

## *INVALID CONCERNS REGARDING LOSS OF CELL PHONE DATA*

When Officer Delcore made the statement that "Through my training and experience I know that the data on a cell phone can be destroyed remotely from the owner of the cell phone or anyone that has access to the usernames and passwords for the cell phone"[59], he either was not remembering his training properly, or he received bad training.

---

[58] (Legal Information Institute)

[59] (Delcore, 2019, p. 4)

18

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



**Dan Corsentino**

Private & Investigative Security Consultants          601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

Nothing is reported by law enforcement that they had a belief that Mr. Andersen Jr. or Ms. Hiteshew were destroying the text messages made or were going to destroy the text messages. The Anderson's did not say they were going to destroy the messages and were not leaving the room, nor were they asking for access to a computer to gain access to the cell phone to destroy data. Officers involved simply state that there is a possibility that it could happen.

As stated earlier, even if the text message were deleted, the information would remain on the "SIM" card of the phone and would be available through a forensic examination of the cell phone. The only way the data would not be available is if the owner of the phone destroyed the "SIM" card. Additionally, even if the data had been wiped from the phone, there are programs that allow for data to be recovered and reassessed. These programs are readily available to law enforcement, negating the need to obtain a phone from an individual who has no readily available means of destroying it at the time.

As documented in Officer Eckert's report, Sergeant Sandoval was eventually aware of how Charlotte was injured. Based on that information, Sergeant Sandoval should have passed on the information on to Sergeant Matarazzo. Sergeant Matarazzo would be able to go to the scene and see if there was any evidence to support the information provided. If Sergeant Matarazzo needed a search warrant for the property, he would have information to put in the affidavit. Medical staff would be able to determine if the injuries were consistent with the child being run over with the car, likely giving him enough evidence to request a search warrant for the property.

## *DISPUTING MR. SAILOR'S EXPERT OPINION*

After reviewing the "Preliminary Report" prepared by Kevin Sailor, our team has concerns about the expert opinion provided.

In the "Opinion" portion of Mr. Sailor's report he states that "It is my professional opinion, based on reviewing the Officers' reports and viewing the body worn camera video, that the officers involved in this incident were acting in good faith and under color of law when they decide to seize Ms. Hiteshew's cell phone."[60] Our team reviewed the same material as Mr. Sailor. We adamantly disagree with his entire statement. The officers had no right to seize the cell phone. The officers were not acting in good faith or under color of law. As stated

---

[60] (Sailor, 2021, p. 6)

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



## Dan Corsentino

Private & Investigative Security Consultants          601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

previously, the officers had no probable cause to seize the cell phone. No search warrant had been issued to seize the cell phone and no exigency existed

Mr. Sailor made the statement "Due to the seriousness of Charlotte's injuries, and the lack of cooperation by her family in explaining how she received her injuries, this would certainly lead a reasonable police officer to have a reasonable belief of a crime being committed.[61]"

According to the Colorado Peace Officers Handbook, "Probable Cause" is defined as:

> "Probable cause - to believe that a certain situation exists requires more fact and more certainty than "reasonable suspicion." A law enforcement officer must be able to articulate facts that would lead a neutral independent magistrate to conclude that, under the totality of the circumstances, there is a "fair probability" that a citizen committed a crime"[62]

Clearly, the reports reviewed show there was not enough information obtained, or attempted to be obtained by officers on scene, to believe a crime was or had been committed. Mr. Sailor must not have reviewed the information in the reports in relation to the information in the Peace Officer's Handbook, or in relation to law enforcement best practices.

Mr. Sailor further stated in his report:

> "It was imperative that any potential evidence by preserving and not seizing the phone immediately could have resulted in a loss of critical evidence... the immediate preservation of the data on the phone would in my opinion, be an exigent circumstance that would permit a warrantless seizure."[63]

Above, we have provided information as to why the seizure of the phone was not necessary to preserve evidence. Additionally, as documented previously, nothing in this case would constitute exigent circumstances to obtain the cell phone from Ms. Hiteshew. Mr. Sailor wrote "Had the officers tried to get a search warrant prior to seizing the phone, the data could have

---

[61] (Sailor, 2021, p. 6)

[62] (IX. Criminal Procedure Guidelines & Officers Field Manual: Definitions-4. Probable Cause, 2017, p. 1644)

[63] (Sailor, 2021, p. 6)

20

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



## Dan Corsentino

Private & Investigative Security Consultants          601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

easily been deleted before a warrant could be obtained[64]." The officers did not have enough probable cause to obtain a warrant. After much review, our team is not sure what information Mr. Sailor was reviewing to come to this conclusion.

The following information was also included in Mr. Sailor's report provided:

> *"The fact that the case was later dismissed by the District Attorney does not change the fact that CJ's actions met the statutory definition of an unlawful act of Obstruction of a Peace Officer. The statute is clear that even if officers are acting illegally (as the plaintiff alleges) it is not a defense as long as the officers were acting under color of his/her official authority. Person are required by law to submit peaceably to the commands and requests of a peace officer"[65]*

Our team finds these statements by Mr. Sailor to be remarkable in fact the actions of the officers involved will not be accepted as qualified immunity. The officers violated Mr. Andersen Jr.'s rights by arresting him, using force on him to take him into custody, and violated his, along with Ms. Hiteshew's right by seizing their cell phones.

# INDUSTRY BEST PRACTICES AND EXPECTATIONS

The reporting of the injuries Charlotte suffered was absolutely a legal necessity. The hospital had an obligation to contact law enforcement because Charlotte came to the hospital with severe injuries. Nothing is documented as to what information PPRH sent over with Charlotte, or if PPRH staff relayed any information given to them by the parents when Charlotte was initially brought into the hospital. It would be hard to believe the parents did not tell medical staff how Charlotte was injured. The information would be critical when Forensic Nurse Jordyn Bode contacted the Andersen family. Nurse Bode could have explained the reason the information was needed from the family. If Nurse Bode had the information, she would be able to communicate with the Andersen's better. If this were done properly, Nurse Bode would not have contacted Colorado Springs Police with the information that the family was being uncooperative and not giving any information regarding the child's injuries.

---

[64] (Sailor, 2021, p. 7)

[65] (Sailor, 2021, p. 7)

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



**Dan Corsentino**

Private & Investigative Security Consultants

601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

Best practice suggestion:

> *"In non-emergency situations, once alerted to the report, the responding officer should conduct a brief, preliminary interview with the reporting party to determine the extent and nature of the possible abuse. Based on this information, the officer must then determine whether there is sufficient reasonable suspicion to warrant further investigation."*[66]

Sergeant Sandoval was the first officer to arrive on scene. As documented by his own report, he did nothing to stabilize the situation; if anything, he exacerbated an already stressful situation. Sergeant Sandoval did not seek out a nurse or medical staff to determine what kind of injuries Charlotte had. Sergeant Sandoval did not communicate with family members in a manner that would allow him to conduct an assessment to determine if a crime had been committed. Instead, Sergeant Sandoval escalated the anxiety the family was feeling for the way the Nurse Bode had treated them, to the way law enforcement was going to treat them.

When Sergeant Matarazzo arrived, he did not follow any of the recommended practices. Instead, he was focused on taking the cell phone from Ms. Hiteshew or Mr. Andersen Jr. Since Sergeant Matarazzo was going to be the primary investigator in this case, he should have followed the following information provided by IACP.

## _ADDITIONAL BEST PRACTICES:_

> *"In any face-to-face verbal communication, the total impact of the verbal transaction can be divided as follows: content, or the message that one is trying to impart amounts to roughly 7 to 10 percent; one's voice inflection and other characteristics of delivery is between 33 and 40 percent of the transaction; and non-verbal, actions, such as body language and facial expressions make up the remaining 50 to 60 percent of the verbal interchange. Therefore, it is truly not what you say, but how you say it."*[67]

> *"Secondly, the underlying key to successfully practicing verbal judo is an understanding and awareness of empathy. Empathy should not be confused*

---

[66] (IACP National Law Enforcement Policy Center, 2012, p. 3)
[67] (Thompson, 2009, p. 1)

22

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be u sed without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



## Dan Corsentino

Private & Investigative Security Consultants        601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

*with sympathy; instead, it can be defined as understanding or viewing a particular situation from the other individual's point of view. In order to effectively empathize, you do not need to agree with the other individual, only be able to place yourself in his or her shoes for a moment in order to better predict his or her reactions[68]."*

*"By empathizing with the other person and recognizing your own personal perspective and attitude it is easier to effectively engage in translation. Essentially, translation means communicating the content of your message in the most appropriate way in a given situation in order to minimize the chance of misunderstanding. Not only will the specific words you utter need to be considered, but also how you deliver them[69]."*

As is apparent by the report from Sergeant Matarazzo and Sergeant Sandoval, none of these best practices were followed, nor were there any attempts to follow best practices. Neither supervisor from either agency attempted to communicate in a manner that would have eased the emotions of the Andersen family.

Sergeant Sandoval stood at the entrance to the room and stared at the Andersen family. No attempt to show empathy was made. His report does not document that he made any statement that would have compassion or empathy.

Sergeant Matarazzo did not document any attempt to show empathy or compassion. Once Mr. Andersen Jr. refused to answer any questions and refused to give up the cell phone, he left the room. Sergeant Matarazzo should have put himself in the position of the Andersen family, understanding their concern for Charlotte and how they had been treated up to this point.

IACP best practice suggest:

*"Communicators should be familiar with the three basic types of people. These include nice people, difficult people, and wimps."*

---

[68] (Thompson, 2009, p. 1)

[69] (Thompson, 2009, p. 2)

23

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



# Dan Corsentino

Private & Investigative Security Consultants                601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

*"Difficult people are the exact opposite of nice people. They will not do what you ask of them the first time, but will instead be eager to ask "Why?" or "What for?" almost as if they are looking for an argument. By not becoming defensive, you have taken the spark away from the difficult person and now have control over the situation."[70]*

Once again, both supervisors failed to follow best practice. Reports reflect that both Sgts. Were frustrated by the lack of cooperation from the Andersen family.

A seasoned law enforcement officer can get frustrated and use the power of arrest, but in this case an investigation was more appropriate. Sergeant Matarazzo had knowledge that Charlotte had been injured in a motor vehicle accident. There was no indication that child abuse was involved. The goal should have been to determine how the accident happened. Trying to take a short cut by reading a text on a cell phone was not going to answer the question that should have been asked by Sergeant Matarazzo.

Under the title of "Triaging a verbal encounter", the following best practice was found:

*"Much like a doctor in an emergency room, it is important for a law enforcement officer to be able to quickly assess a situation and determine how best to proceed. In the case of verbal encounters, the triage should focus on the following aspects. First, the officer must view the situation from the perspective of the individual(s) involved."*

*"Next, the officer should identify how the other individual is different from himself or herself with respect to his or her beliefs, background, and emotional state. Rather than become frustrated, the officer should tailor his or her approach in a manner that will help calm her emotions and generate a trusting relationship."[71]*

An officer with experience on the job should be able to recognize the importance of taking a breath, reevaluating how the investigation is going and be able to change how he proceeds with the investigation when confronted with a person who does not want to cooperate. Making

---

[70] (Thompson, 2009, p. 2)

[71] (Thompson, 2009, p. 2)

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



**Dan Corsentino**

Private & Investigative Security Consultants

601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

an arrest would be the last action I would want to make in this incident, especially in the room where the injured child was. No attempt was made by either Sergeant to calm the situation or emotions of the Andersens.

Additional best practices:

> *"The third tool is asking; specifically, using the five different types of questions to obtain information and build trust. Fact finding questions are those that ask for specific data and are usually easy to answer, although they are not always well-received. General questions are usually open-ended and allow the individual to choose how he or she wants to respond. Opinion-seeking questions are typically very well-received, as they indicate to the individual that the asker is genuinely interested in what he or she has to say. These three types of questions are the most valuable during verbal encounters and should be used as much as possible. Opinion-seeking questions are especially beneficial for relieving tension and for building trust in verbal communication. Officers should avoid direct (i.e. yes/no) and leading questions if possible, as they are often seen as accusatory and antagonistic.[72] "*

Reports provided by Sergeant Sandoval and Sergeant Matarazzo showed no attempt to ask questions in the recommended manner was attempted. The job of an investigator is to "investigate". This requires you to ask questions. If asking questions one way is not getting you the answers you need, an experienced officer tries asking questions in another way. It has been my experience that even the most uncooperative person will answer a few questions when asked in the best manner.

## CONCLUSION

In the case of Carl Andersen Jr., there are many noticeable concerns that have a direct or indirect bearing on the case itself. This case begins with a communication by a nurse that the Andersen family was being very difficult. This nurse stated that the Andersen family was not cooperating with the questions that were being asked by medical staff concerning the injuries that Charlotte had suffered during the accident.

---

[72] (Effective Police p. 3)

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



## Dan Corsentino

Private & Investigative Security Consultants

601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

As a result of this statement, a Colorado Springs Police Sergeant was dispatched to Memorial Hospital. From all indications in reports and body cam footage, Sergeant Sandoval walked into the situation with a predetermined mindset and explicit attitude, neglecting to conduct his own investigation prior to making assumptions. Concerningly, Sergeant Sandoval only relied on the information of Nurse Jordyn Bode. Perhaps his attitude would have changed had he conducted his own investigation, which very likely would have changed the outcome by influencing the tone of the conversation and overall attitude with the Andersen family.

A holistic concern that presents itself is whether or not the Sergeant's attitude is representative of the entire administrative staff and decision makers in the Police Department itself. Perhaps the greater question is whether there is a disconnect between the Executive staff, Mid-Management, as well as the Line Officers of Colorado Springs Police Department. When there is a disconnect, the predictable outcome is a misrepresentation of the community policing policy that exists within the department. Often, the result of this is unfavorable and poor decision making, as seen in the case with Mr. Andersen Jr. and his family.

As a Police Executive for over 20 years, I am somewhat dismayed that the Sergeants in this case- with all of their experience- would make no effort to first understand the stress of the family before jumping to conclusions about their behavior. At that moment, they were living through every parent's worst nightmare, not knowing if their infant child would live or die. The pregnant mother was already emotionally exhausted from the chaos of the event, and her fiance was doing his best to remain strong and brave for her and their daughter after such a traumatic event.

The actions of these officers were unprofessional, to say the least. These officers had numerous options that they did not utilize. Their decisions caused the situation to become unreasonably hostile, ultimately resulting in a Use-of-Force incident that was excessive in nature and unnecessary in its entirety. Rather than resorting to this, officers could have resorted to numerous options, including but not limited to the following:

1. Officers could have retreated from the room, out of line-of-sight from the family, and requested another officer. This officer could then re-establish a relationship with the Andersen family, utilizing a calm, professional approach and thorough communication, while also being empathetic to the environment and situation.

26

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



## Dan Corsentino

Private & Investigative Security Consultants

601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

2. Officers could have reprioritized their decision to obtain the cell phone immediately. As discussed in the body of this report, Officer Delcore was mistaken in his thought process that the information on the cell phone could be easily destroyed. That was not true. As suggested above, a more reasonable approach would have been to exercise empathy and concern for the child, allowing officers to build a relationship with the family. Failure to do this exacerbated an already tenuous situation with a very protective U.S. Marine Veteran, whose concern was his pregnant fiance and critically injured child.

3. Officers could have requested the Head Nurse to seek out a Social Worker, Minister, or other person of authority within the hospital to act as a mediator between law enforcement and the Andersen family. This would have provided a neutral third party who could remain sensitive and empathetic to the family's situation while still relaying the necessity of the officer's request to Mr. Andersen Jr. and Ms. Hiteshew.

4. Officers could have requested a victim's advocate to take the lead in the hospital, allowing for law enforcement to step out of the room and assist by receiving information from the advocate.

What is disturbing about this case is that Mr. Andersen Jr. was recognized as a Marine Veteran by officers on scene. Despite this, he was not approached with or conversed with in the manner of respect Marines represent. Not only was Mr. Andersen Jr. trained under a similar code of ethics and morals as police officers, but he has served his country proudly under that code.

Additionally, because Mr. Andersen Jr. is a former Marine, he should have been treated as a possible combat veteran. It is well known that combat veterans have the capacity to react differently from the general public when being confronted with a physical threat. Mr. Andersen Jr. happens to be a combat veteran with two tours of duty in a combat zone.

When Officer Delcore walked behind Carl Andersen Jr., this could be - and likely was- considered a violation of Mr. Andersen Jr. personal space. What is more, Mr. Andersen Jr. was already on high alert due to the situation his family was in, so Officer Delcore's decision to place himself behind an already stressed Mr. Andersen Jr. influenced the combat veteran to be more hyper-sensitive to an attack. Despite his training as a combat veteran, Carl Andersen Jr. showed remarkable restraint by not reacting as he had been trained. Mr. Andersen Jr. was more

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516



**Dan Corsentino**

Private & Investigative Security Consultants          601 N. Sante Fe Ave. Pueblo, CO ~ 719-696-9516

than capable of stopping the officers from placing handcuffs on him. If Mr. Andersen Jr. were reverting to his training, he would have turned to Officer Delcore, who presented the biggest threat by pulling out his Taser, and dealt with Officer Delcore in a violent manner. As seen through Officer Delcore's body cam, Mr. Andersen Jr. was not taking a defensive stance, or balling up his fist, as Officer Delcore wrote in his report. It is critical to understand how Officer Delcore's actions influenced the actions of Mr. Andersen Jr., specifically when he pulled his arm away from the officer and resisted arrest.[73] Furthermore, the attitude and approach by Sergeant Sandoval prior to the arrival of backup likely influenced Mr. Andersen Jr.'s perspective of how the situation would unfold, causing him to become stressed and defensive.

Holistically, the behavior of officers involved in this incident raises a greater concern about a subculture that exists in patrol officers of Colorado Springs Police Department and the Teller County Sheriff's Office, and other agencies, as compared to an experienced Detective. Patrol officers look at calls assigned to them as a situation to handle, then move on to the next call. An experienced Detective would handle the case as a crime to be investigated, then solved. Time is on your side when investigating most cases. Officers in this case rushed to judgement and assumed the text messages on a cell phone would solve their case, instead of conducting a thorough investigation: IE: a crime scene investigation, interview with hospital staff, interview with family members and interview with witness'.

---

[73] (Delcore, Delcore_21.06 Bates NO.72)

28

This information is owned by Dan Corsentino of D.C. Investigations & Security Consultants and is proprietary. It may not be used without permission.
601 N. Sante Fe Ave. Pueblo, CO, 81003
719-696-9516